IN THE

# Supreme Court of Georgia,

## AT ATLANTA.

### MARCH TERM, 1886.

PRESENT—JAMES JACKSON, . . . . . . . . CHIEF JUSTICE.
SAMUEL HALL, . . . . . . . . . ASSOCIATE "
M. H. BLANDFORD, . . . . . . . . ASSOCIATE "

### TURNIPSEED *et al. vs.* SCHAEFER *et al.*

1. This court has held that the act of 1881, which provides that, in all cases of voluntary assignments by insolvent debtors for the benefit of creditors, it shall be the duty of the assignor to prepare and attach to the deed or instrument by which the assignment is made, at the time of executing the same, a full and complete inventory and schedule of all the assets of every kind held, claimed or owned by the assignor at the time of the execution of such deed or instrument of assignment, which inventory or schedule shall be sworn to, and which provides that no assignment by insolvent persons, firms or corporations shall be valid unless accompanied by the sworn schedule so required, is a remedial statute and should be strictly construed as against the assignor and his assignee, and liberally in favor of creditors; and the act of 1885, which requires a full and complete schedule of the creditors of the assignor under oath to be attached to the assignment, being of the same character as the other act, and being in furtherance of the same policy, is subject to the same rules of construction.

(a.) The difference between a schedule which is not full and complete and no schedule at all is a difference in degree only, and should not vary the application of the rule prescribed by the statute.

2. It is impracticable to lay down any rule as to what may safely be omitted from such schedules, either by oversight or inadvertence,

and without any intention to do so on the part of the assignor, or any purpose to mislead creditors by filing a false, deceptive or incomplete schedule. Generally speaking, the requirements of the law and the conditions it prescribes should be closely followed; at least, an honest effort should be made to carry it fully into effect according to its purport and intent. While the omission from the schedule of assets of some slight or unimportant article, of little or no value, or some one or more creditors whose claims amounted to a trifle, and which would probably be overlooked or forgotten by the most careful, deliberate and painstaking person in preparing his schedule, might not have the effect of invalidating the assignment, yet in a case where creditors claimed that assets amounting to nearly $3,000 were omitted, and the assignor conceded, after this omission had been brought to his notice by the evidence adduced on the trial, that assets to the amount of nearly $1,300 were omitted from one schedule, and sundry creditors, whose undisputed demands were shown to aggregate more than $1,000, were omitted from the other, and sought to supply the omission by then amending his schedule in both respects, the claim of slight and inadvertent omissions would hardly avail to maintain the assignment.

3. There is a distinction between the provisions of the act of 1881 relating to the criminal liability of the affiant and those which relate to invalidating the assignment. In the one case, there must be both the act and guilty intent—a willful violation of the public law, in which there must be a union or joint operation of act and intention, or criminal negligence; in the other case, this is not necessary, where the question in issue is the validity of the assignment.

(*a.*) The act of 1885 provides for invalidating the assignment for want of a full and complete schedule of creditors, but does not contain a criminal provision.

(*b.*) No provision is made, either by the act of 1881, or by that of 1885, for perfecting a schedule which is not full and complete, and by that means upholding the assignment; and the courts cannot uphold it by reason of such an amendment.

4. A general clause in an assignment conveying to the assignee such property of the assignor as was left out of the schedule of assets does not render the assignment valid, but contravenes the policy of the legislature in enacting the assignment laws; and the law looks with distrust upon such sweeping clauses in deeds, especially where particularity of detail is required.

5. While preferences in assignments are allowed, they are tolerated rather than encouraged, as is manifest from the drift of legislation in this state from 1881 to the present time, and made clear by the provisions of the act of 1885.

(a.) The act of 1885 carried fully into effect the policy proclaimed in §§1945, 1946 of the Code, as well as in art. 1, sec. 2, par. 6 of the constitution of 1877 (Code, §5023), by throwing wide the doors of courts of equity to creditors of every class and description, whether they have a lien or not, and inviting them to enter and avail themselves of its remedial process and aid, that facilities may be afforded them to detect, defeat and annul every effort to defraud them of their just rights, and that they may be enabled to reach the property concealed from them by their debtors.

(b.) The deed of assignment in this case must be set aside, and the refusal to grant an injunction and receiver reversed.

May 1, 1886.

Assignments. Debtor and Creditor. Laws. Public Policy. Fraud. Before Judge STEWART. Henry County. At Chambers. December 17, 1885.

W. W. Turnipseed filed his bill in behalf of himself, and such other creditors as might join with him, against George Schaefer, Harry Schaefer and J. S. Akers. M. C. and J. F. Kiser & Co., Tolbert, Hoyt & Co., S. M. Price, R. A. Henderson, Mrs. R. A. Henderson, Harralson Bros. & Co. and Kerr & Co., non-preferred creditors, were made parties complainant before the hearing, and amendments to the bill were filed. The substance of the bill and amendments was, in brief, as follows :

On November 9, 1885, George Schaefer was in failing circumstances, and had been so for some time, but possessed of assets worth about $60,000 or $70,000. On that day, he attempted to make an assignment, purporting to be for the benefit of his creditors, to Harry Schaefer and J. S. Akers, as assignees. They accepted the trust, took charge of the property set out in the inventory of assets, and proceeded to dispose of the same, or a portion of them. After this had continued for ten days, the assignor and assignees recognized it as invalid for want of a schedule of creditors, with their residences, amounts, etc., and on November 19, 1885, they voluntarily repudiated it, and George Schaefer made a second assignment to them, giving preferences to S. M. Inman & Co. and George Ober, Sons &

Co., first, and with three classes of preferred and one of non-preferred creditors.

The two assignments were exhibited to the bill. The first was dated November 9, 1885, and purported to convey all of the assignor's property to the assignees, with certain preferences, Inman & Co. and George Ober, Sons & Co. being the first preferred creditors. This deed had no schedule of creditors attached. It stated in the latter part of it that the assignor appointed the assignees "his true and lawful attorneys, in fact, irrevocable," etc.

The second assignment was dated November 19, 1885. It recited that, whereas, the assignor attempted to make an assignment on November 9, but neither he nor his attorney was aware of the passage of the act of 1885, requiring a schedule of creditors, and attached none; "and whereas, some of the creditors of the party of the first part dissent to the assignment, and insist that the same is void for the want of said sworn schedule; and whereas, regarding the said assignment as void, and as the said parties of the second part have, for said reason, relinquished all their rights, titles and interest in the same to me," he thereupon re-assigned.

This assignment of November 19 was to the same assignees as the former.

There were three classes of preferences, viz.: First,

S. M. Inman & Co................................................ $45,726 14
Attorney's fee for assignment.............................. 1,000 00
Ober, Sons & Co................................................. 15,000 00

Second. Certain guano companies and one Pullen.

Third. Five other creditors; and fourth, general unpreferred creditors.

This assignment contained the following clauses:

"The intention of the said party of the first part, in making this conveyance, is to transfer all of his property and effects of every kind and description, and everything in which he has any right, title, interest in or claim to; and if anything has been left out of schedules 'A' and 'C' hereto attached, such omission has been made inadvertently, and without any intention on the part of the said George

Schaefer; and if anything has been so omitted from said schedule, the parties of the second part are hereby directed and required to take as full and complete possession and control of any such property as if the same was regularly set out and described in this conveyance; if any creditor has been inadvertently omitted from the schedule of creditors, marked schedule ' D,' hereto attached, they are likewise instructed to pay such creditor, or creditors, upon proper and satisfactory proof of his or their claim, as if the same were regularly scheduled; provided, the funds in their hands are sufficient for that purpose, but if not sufficient to pay all creditors of the said George Schaefer in full, then such claims are to be paid in the manner that class No. 4 of schedule ' D ' are directed to be paid."

The guano notes and stock on hand were declared to belong to the guano companies respectively, as security, until their claims should be paid in full; and if any balance remained, it should return to the assignor's estate; if any deficiency, it should be classed among the unpreferred debts.

Attached to the second assignment were what purported to be sworn schedules of assets and creditors.

The bill alleges that both assignments are void, and especially attacks the second—that made November 19th, 1885. The points made were, in brief, as follows:

(1.) The entire transaction was fraudulent. The inventory of assets attached to the first assignment stated certain values on the assets, pretending to show that the assignor had assets worth $185,000; and he pretended that he was possessed of that amount of assets, and that his debts were only $135,000, and thus sought to mislead his creditors, and did mislead and lull them into security, making them believe that there was enough to pay all creditors, while at the same time he was confederating with his assignees to place the property beyond the reach of legal process by his creditors. The values so stated were false and fraudulent, the real value of the estate being only $60,000 or $70,000, while the liabilities were largely in excess of the amount stated in either assignment. The assets are put in the second assignment at about $129,000. Since the second assignment, George Schaefer and his assignees have continued

v 76-8

these representations, and have pretended to complainants and others that the assets were sufficient to pay all the debts, and that it was to their interest to remain quiet and take no steps to enforce their claims, as they would much sooner get their money. In fact, at this very time, Schaefer and his assignees were colluding, and were proceeding to sell the property in haste and at small prices, and were seeking to place the proceeds beyond the reach of complainants and other creditors.

(2.) The assignor did not attach to either deed of assignment a true and correct statement of his assets, but left out valuable assets owned by him, including notes, accounts, cotton, money, his interests in certain firms, etc., worth several thousand dollars. It was alleged, by amendment, that the assignor and assignees acted so in concert, and colluded and confederated together so constantly, that it was difficult to obtain definite information on this or other subjects; but a number of items were specified, and others were alleged to exist.

(3.) The assignor did not attach to either deed of assignment at the time of executing it a full and complete inventory and schedule of all his debts, sworn to by him. He omitted and left out large debts and fraudulently stated the amounts due the preferred creditors at incorrect amounts.

By amendment, the following omissions of creditors were specially charged, and others were alleged to exist:

| | |
|---|---:|
| S. B. Kimball | $384 00 |
| W. W. Turnipseed | 400 00 |
| Harralson Bros. & Co | 100 00 |
| J. A. C. Wynn | 71 82 |
| Mrs. R. A. Henderson | 300 00 |
| R. A. Henderson | 81 43 |

Claims of Hammond, Hull & Company, of Baldwin & Company, and others, are untruly stated.

(4.) Preference is given to debts of Edward Schaefer and Schaefer & Company, instead of to the assignor's own debts, which is in fraud of his creditors.

(5.) Both assignments are void because made so as to reserve a benefit to the assignor; and though this may have been concealed under the language of the deed, it was, in fact, so intended, and the assignor and assignees were proceeding for that purpose.

(6.) The second assignment was void because the assignor and assignees could not voluntarily set aside the first, after accepting and acting under it.

(7.) The assignor fraudulently left out of his assignment certain creditors, and he and the assignees had paid some of them, to conceal the omissions and defects in the assignment, and in fraud of creditors.

(8.) The assignment seeks to hinder, delay and defeat complainants and other creditors, and such is its purpose and effect.

Insolvency of the assignor and assignees was charged; that one of the assignees was the brother and ex-clerk of the assignor, and the son-in-law of a large preferred creditor; and the other was a confidential clerk of the largest preferred creditors; and it was charged that the debts of these creditors were not truly stated. The assignor and assignees are charged to have colluded throughout, and that the assignor was allowed to remain in possession of real and personal property, and use the same for his own benefit. Discovery was waived.

The prayers were for injunction and receiver, to set aside the assignments, to subject the assets to claims of creditors, for subpœna and general relief.

Restraining order was granted December 2, and assignees made *quasi* receivers.

The answers presented, in brief, the following defences to the points made:

Admit the making of the first assignment, its setting aside, and the making of the second assignment. Deny all fraud or collusion, and say the assignees had only sold a small amount of goods when the second assignment was made; that "the creditors of this defendant, except those

in the first preference under that assignment, declared
that they would not be bound by it; that it was null and
void, because it did not meet the requirements of the stat-
ute in the particular mentioned;" that no creditor had ac-
cepted or recognized the first assignment as binding, except
those in the first preference, and they consented to the
relinquishment and re-assignment; that he did not know,
when he made the second assignment, that the first would
be attacked, because he himself regarded it as void and
not passing title, and was advised by his attorney that he
could make a second assignment. The assignor says that
he placed on his real estate a value of fifty to eighty-five
cents on the dollar of what it cost him; on his merchandise
an inventory of the cost price; on his personal property
what he thought a low valuation, and on his notes, ac-
counts, etc., no valuation except their nominal value. He
stated to some of complainants and others that he did not
desire to be sued; that if he could keep his health, he would
get on his feet again financially and pay his entire indebt-
edness; and that, if he could keep his health and manage
his business, he believed he could make the assets pay all
of the indebtedness; but these things were honestly done,
and without intention to deceive creditors. He further
states that he labored earnestly and faithfully to obtain a
full list of his creditors and a full and complete statement
of his assets, but that, in spite of his efforts, he omitted
both assets and the names of creditors. (The assets and
creditors admitted to have been left out will be stated in
the evidence) Some of these were discovered since the
assignment by the assignor, and some he forgot to put in.
"This defendant here solemnly states that the failure to
insert the aforesaid assets and the aforesaid names of cred-
itors was an oversight and omission on his part; that the
existence of the omitted assets and omitted indebtedness
entirely escaped him at the time he made his said assign-
ment. All fraudulent reservation or concealment is de-
nied. He had not a pound of cotton or a dollar of money

at the time of either assignment. The interest in firms charged to have been owned by defendant had been settled long before the assignment. The note of Edward Schaefer was endorsed by the assignor, rendering him liable thereon. The note of Schaefer & Company was endorsed by the assignor, and given to Inman & Company for money loaned to him for said firm of Schaefer & Company. All reservation for the benefit of the assignor is denied. The assignor denied paying any debts since the assignment. Admits the relationship. of Harry Schaefer to the assignor and of Akers to the leading preferred creditors, but says they were selected on account of their competency and familiarity with the business. He believes the alleged indebtedness to Inman & Company, the first preferred creditors, is correct, and the debt due Gill, a second preferred creditor, and father-in-law of Harry Schaefer, amounts to $6,800, instead of $6,200, as set out in the assignment. The first preferences are to S. M. Inman & Company, of Atlanta, and G. Ober, Sons & Company, of Baltimore. Both had befriended him, and each had liens on most of his real estate, and he felt an obligation on him to prefer them. Assignor's health failed, and he was obliged to assign ; and under the management of the assignees, the assets may not pay more than sixty cents on the dollar. The assignees deny allowing the assignor to reserve any benefit to himself, and say they have taken charge of all the assets and have recognized all creditors, so far as came to their knowledge, whether included in the schedules or not. They deny insolvency, and make the same statement as to their selection as that made by the assignor. In respect to the dealings between the assignor and one Edwards, charged in an amendment to the bill, the assignor says he had dealings with Edwards, but he was acting as the agent of W. M. & R. J. Lowry for the lending of money. The defendants deny that the assignor has control or management of the assets since the assignment, but say that he is allowed to occupy the

dwelling-house as a tenant, subject to be sold at any time. The assignor says that the household and kitchen furniture, phaeton, buggy, horses and cow, not put in the inventory, belonged to his wife.   He says that the amounts of the accounts of Baldwin & Company and Hammond, Hull & Company were put in the schedules as stated by them. Defendants state also that Kimball, Wynn and Smith (creditors charged to have been paid since the assignment) were not paid from the assets of the assignor, but by S. M. Inman & Company; that cotton bought by Schaefer of those creditors had been shipped, before the assignment, by him to Inman & Company, and they had charged up the cotton on his account; that the cotton was bought by him for cash, but he had not paid for,it; and that, since the assignment, Inman & Company have, through Harry Schaefer, one of the assignees, paid those parties.    The assignor denied owing Henderson or Mrs. Henderson.

On the hearing, on December 17th, numerous affidavits were introduced by both sides.    So far as material, the evidence for the complainants showed, in brief, as follows:

George Schaefer was in failing circumstances some time before the 9th November, 1885, and for several days prior to that time was having an inventory prepared with a view to the assignment.    While this was being done, and he was insolvent, he borrowed, through his clerk, five hundred dollars from one of the complainants, in order to pay for some cotton, the clerk saying that complainant could get his money at any time he called for it.    The first assignment was on Monday.    Up to and during Saturday night, large quantities of cotton were shipped away from the assignor's place of business, and on Sunday, Harry Schaefer carried away with him to McDonough a large sum of money.   Since the assignment, George Schaefer has frequently promised Price to pay him, and when Smith was settled with, George Schaefer told Price that he would pay him next.    The day after the assignment, the books of the assignor showed $800 on hand.   While the schedules

were being made out, Combs, who was a clerk assisting in the work with Harry Schaefer and another clerk named Shell, and whom Schaefer owed for services, made inquiries as to what it was for, and Shell replied that Harry Schaefer was going to take an interest as partner with his brother. Since the assignment, Combs has been paid, his debt not being enumerated in the schedule. One car-load of cotton was shipped away after the first assignment. The first assignment placed assets at about $185,000, and Schaefer, the assignor, told Turnipseed and others that he would pay their accounts, and told Turnipseed to keep quiet and not to be uneasy, and assured him that his account should be paid. Turnipseed waited several days, and then learned of the making of the second assignment. His name was not put in as a creditor, and he again sought payment of all or a part of his claim from George Schaefer, who again made him promises, but not having been paid, he filed this bill. On November 19, the assignees relinquished their rights under the first assignment, and at the same time received the second. The first assignment had been partially recorded in the clerk's office, when it was withdrawn from the clerk's possession by the assignees, and the inventory accompanying it was altered and changed and utilized in making up the second assignment. In neither assignment does the assignor include a cent of money or a pound of cotton, though he was doing a cotton business at three different points. The assets were estimated in the second assignment at $129,000. The entire assets of the assignor were returned by him for taxation, in 1885, at $31,350. One item, namely, city property, put in the schedule as worth $24,000, was returned for taxation at $8,000. In his sworn tax return, George Schaefer also had an item of $500 for household and kitchen furniture not put in the assignment; also an item of $800 for horses, mules, etc. The assignees have sent a printed dun to G. W. Bryan, though no claim against him is stated in the inventory. A note made by a Mrs.

Waldon to George Schaefer for $100 was omitted from the inventory. From the second assignment and schedules the following creditors were entirely omitted:

| | |
|---|---|
| S. B. Kimball........ ............................................... | $384 50 |
| W. W. Turnipseed.......................................... .......... | 400 00 |
| Harralson Bros. & Co.... ...................................... | 100 00 |
| J. A. C. Wynn...................................................... | 71 82 |
| R. A. Henderson................................................. | 818 43 |
| Mrs. R. A. Henderson.......................................... | 307 17 |
| | $2,081 92 |

Kimball's claim was partly composed of $82.50, borrowed on November 9, the date of the first assignment. Since the assignment, he has been settled with in full. Wynn testified that he was paid off by Harry Schaefer after the assignment, his debt being in the shape of a due-bill, and that Harry Schaefer exhibited much anxiety about the matter.

Notes for $2,120.55 were given by Schaefer to M. C. & J. F. Kiser & Co. (complainants) on the day on which he made the first assignment.

A witness, Battey, testified that the amount due Hammond, Hull & Co. was not correctly stated in the assignment, nor was it in accordance with their bill made out against Schaefer; and that it is not true that he, representing that firm, had anything to do with the making of the assignment; that the assignor admitted to him having used money collected for Hammond, Hull & Co.; that he also stated that Inman & Co. were too grasping, and were trying to get the entire assets: also, that Harry Schaefer was his (George Schaefer's) "mouth-piece;" and that Akers was Inman & Co.'s "mouth-piece;" and that the former would follow his views in reference to the guano men.

The first preferences, stated in the assignment of November 19, are:

| | |
|---|---|
| S. M. Inman & Co...................... ...................... | $45,726 14 |
| Attorney's fee for drawing assignment............... | 1,000 00 |
| Ober, Sons & Co.; principal.............................. | 15,000 00 |

The actual value of the entire estate is not above about $60,000, and debts much more than that sum.

Each of complainants introduced proof of his claim, either by promissory note or sworn account.

The evidence for defendants was, in brief, as follows:

An instrument executed on December 15, 1885 (sometime after the bill was brought, and after temporary restraining orders, etc., had been granted), by George Schaefer, in which he set out that in his assignment of November 19, he had honestly endeavored to make complete schedules of assets and creditors, but that, on account of the complicated nature of his business, the number of items of assets and the number of creditors, he had " inadvertently and accidentally, and without any intention whatever to do so," omitted certain creditors and assets. He then stated that he did therefore " amend and supplement the same " by adding assets and creditors omitted, as follows:

Assets admitted to have been omitted:

| | |
|---|---|
| 192 sacks salt, invoiced........................ ... ................. | $147 84 |
| Note on J. W. Welch......................................... | 300 00 |

Notes and accounts in hands of Tye, attorney, for collection. (Cannot give particulars because not known, and cannot get information from attorney; not considered of much value.)

| | |
|---|---|
| Whatever interest assignor has in bill of sale from E. R. James to him for............. .......... .................. | $800 00 |

(Assignor says he endorsed notes of James to Crawford for $800, and took bill of sale to hold him harmless; is informed that a considerable portion of the debt is paid, but does not know how much.)

| | |
|---|---|
| Suit pending in Henry superior court in name of George Schaefer against R. A. Henderson for... | $1,050 00 |
| Total........... ...............................................:............. | 2,297 84 |

(While in assignor's name, he says this suit really belongs to a Mrs. Barker, of Baltimore, and I forgot to place it in his schedule and make the statement of its ownership.")

(The salt is alleged to have been sold, and the proceed to be in hands of assignees.)

Creditors admitted to nave been omitted:

Holston Salt and Plaster Company, Saltville, Va.................$  147 84
.W. W. Turnipseed, Hampton, Ga......................................  272 27

("I do not admit the correctness of this amount, but he claims an account against me of $399.02, and I have paid him on his account $126.75, and if his account is correct, this will leave a balance due by me to him as above stated.")

J. A. Crawford, Atlanta, Ga., about................................  800 00

(Same explanation as above made as to bill of sale.)

Rent of R. A. Henderson's interest in warehouse at Hampton, Ga., $100 per annum. (This was to be credited on the claim of Mrs. Barker.)

Assignor endorsed note of Buford and Patterson to Griffin Banking Co. for $500. (To secure himself against loss, and also to secure $800 due him by Buford, took a deed to lands, described in schedule).............................................  500 00

                                                          $1,720 11

" The foregoing omissions were the result of oversight, and were not made with the view of secreting any property or of defeating any creditors."   Has notified the assignees of omissions.—This paper is sworn to contain all omissions " so far as he knows."   It was never attached to the assignment nor recorded.

A number of affidavits were introduced, in brief, as follows:

Assignor states that the household furniture, etc., belonged to his wife, and had so belonged for several years, but were returned by him for taxation, as had been his habit.   He returned his property for taxes at a low valuation, as everybody else does.   He knows nothing of the borrowing of the money from Price, though his clerk, who did so, had authority to conduct the business.   When he learned of it, he placed Price in his schedule as a creditor.

He had nothing to do with the paying of Smith, Wynn, Kimball or Combs; did not borrow money from Kimball or Wynn, but was informed by his clerk that the indebtedness was for cotton bought of them; denies indebtedness to Mr. or Mrs. R. A. Henderson; denies shipping cotton secretly or at night. The cotton that was shipped was bought with money furnished by S. M. Inman & Co., under contract that he would buy and ship to them. The money taken by Harry Schaefer before the first assignment was paid out on debts. The assignees also stated that the payments made since the assignment were not made with Schaefer's funds, but with funds received from S. M. Inman & Co., and were made through Harry Schaefer. The debt of Combs, Harry Schaefer stated, he paid with his own funds, in order to get rid of the annoyance of being frequently dunned.

[In response to this, complainants introduced Harry Schaefer's tax returns, showing that he only returned $300 worth of property.]

The Walden note never belonged to George Schaefer, but to Harry Schaefer; though made in the name of the former, it was given for a horse which belonged to the latter. Bryan had been settled with before the second assignment, and the dun sent him was a mistake. Harry Schaefer denies exhibiting any anxiety about the settlement with Wynn. The Harralson note was one of those signed by George Schaefer with James, and he did not know that it was held by them before the assignment. Mrs. Schaefer also made affidavit to owning the furniture.

Counsel stated that when the first assignment came to them from the clerk, the schedules were detached; that two classes of preferred creditors were consolidated, and certain changes made in the statement of assets, and the schedules were used in making up the second assignment.

The assignees stated that they had control of the property. Inman & Company testified that the debt to them was correctly stated, and that no interest or benefit was reserved

by the assignor that they knew of. So also stated Gill, except that his debt is put at $600 too little. Ober stated that he knew of no reservation of interest or benefit to the assignor; that he was present when the second assignment was signed, and all was fair and *bona fide*, so far as he knows. George Schaefer states that the business at two of his stores—at Locust Grove and McDonough—was conducted by his clerks, and he has no personal knowledge concerning it. Denies statements testified to by Battey as to the assignees being mere mouth-pieces.

The assignment of November 19, 1885, was introduced. It recited that the first had been abandoned and relinquished on account of the want of schedules, and assigned the assignor's property to the same assignees for creditors.

There were affidavits as to the character and business standing of Akers, and that he was worth ten or fifteen thousand dollars.

Other points in dispute need not be set out in detail. The chancellor rendered the following decision:

"After hearing bill, answer, affidavits and arguments of counsel, it is the order and judgment of the court:

"First. That the assignment made by George Schaefer on the 9th of November, 1885, was void.

"Second. That the assignment made on the 19th of November, 1885, by the said George Schaefer transferred the title of his property to the assignees for the uses and purposes therein set forth.

"Third. It is the opinion of the court that, under the evidence in the case, the said George Schaefer used ordinary diligence in endeavoring to return a correct list of his creditors and a correct schedule of his property; and, in the opinion of the court, a substantial compliance with the statute touching this matter is all that is required; and in the absence of fraud, an assignment ought not to be held invalid if a small number of creditors or inconsiderable amount of property should inadvertently be omitted by one making an assignment; therefore prayer for injunction and receiver refused."

Fourth. Required the assignees to give bond to carry out the trust imposed by the assignment.

Complainants excepted and assigned the following errors:

(1.) In holding that the first assignment could be voluntarily abandoned and a second made.

(2.) In holding the second assignment valid, and that it transferred title to the assignees.

(3.) In ruling and deciding that the assignor used ordinary diligence in endeavoring to return a correct schedule.

(4.) In ruling that a substantial compliance with the assignment acts in respect to the schedules is all that is required, and that small, inadvertent omissions of assets or creditors would not invalidate the assignment.

(5.) In refusing an injunction and receiver.

(6.) In continuing the assignees in office.

JOHN L. TYE; J. H. LUMPKIN; G. W. BRYAN, for plaintiffs in error, cited as follows:

Full and complete schedules, Acts 1880–1, p. 174; Code, 1882 (addenda), p. x, §1953 (d), (e); Acts 1884–5, pp. 100, 101.

Strict construction against assignor and assignee, 70 *Ga.*, 293 *et seq.; Coggins vs. Stephens & Co.;* 73 *Ga.*, 414.

Strictly construed act, party must come within letter of, 71 *Ga.*, 678; 74 *Id.*, 493, 762.

Public policy in favor of creditors, Code, §§1945, 1946, 5023 (Constitution 1877, Art. 1, Sec. 2, par. 6); 71 *Ga.*, 815; 70 *Id.*, 293; Acts 1880–1, p. 124 (the " McCay act.")

Statute in plain words must be obeyed as written, 1 Kent's Com. 468 and note (b); Bac. Abr., " Statute," I, 2, p. 240; 3 *Ga.*, 146, 154, 158.

Criminal part of act of 1881 unlike, and construed differently from, civil part, Code, §§3749, 4292 ; Potter's Dwar., p. 247, note 36; Sedgwick, p. 310; 2 Johns. Cas., 89–90 3 *Ga.*, 146; 1 Doug. R., 706; 72 *Ga.*, 815. (No such feature in act of 1885.)

Assignment statutes mandatory, 12 Abb. Pr., 35–37; 1 Beas. (N. J.), 229; 16 Abb. Pr. (N. S.), 23, 31–32.

Requirements precedent to validity, strict compliance necessary; *aliter*, as to duties or directions subsequent, 14

Barb., 39, 48; 14 East., 568 (New ed., 546, 549); 39 N. Y., 196 *et seq.*, 199, 200; *Ibid.*, 369; 2 Abb. Pr., 373; 10 Kans., 47; 28 Minn., 118; 4 Penn. St., 477, 479; 46 *Id.*, 415; 34 *Id.*, 152; 10 Neb., 511.

Rulings in different states reconciled by reference to statutes of such states, Rev. Stats. Ind., §§2662, 2676, (See 26 Ind., 245; 76 *Id.*, 28); N. Y. Laws 1860, p. 594; Laws 1874, p. 624; Laws 1877, p. 548 *et seq.*, sec. 3, sub-sec. 5, sec. 25: Laws 1878, p. 408 (85 N. Y., 464); Hurd (Ill.), 147, 631; Rev. Stats. Ill. (1874), ch., 72, pp. 585–6, §§6, 7, 16; Code Iowa, p. 383, §§2115, 2117; Pub. Stats. Mass., ch., 157, §§19, 22, 23; Mich. Acts 1879, p. 181–2, §§3, 6; Stats. Minn. (1878), p. 544, §27; 1 Rev. Stats. Mo., ch. 5, secs. 354, 361.

General clause for changing or adding to schedules violates statute and invalidates, 49 How. Pr., 284, 287–8; 11, Wend., 203 (S. C. 4 Paige, 247); 1 Am. Lead. Cas., 68 *et seq.*, (side p. 63 *et seq.*), and citations; 4 Den., 217; 7 Paige Ch., 568; 6 Barb., 39; 4 *Id.*, 546; 20 Kans., 165; 14 Johns., 458; 7 Hill, 438; 10 Paige, 223; 2 Dutch. (N. J.), 22.

Amendment of schedules not allowed, 70 *Ga.*, 293, 296–7; 14 Barb., 39, 48, 50 (*ut sup.*).

Amendment here proposed after injunction granted and bill filed, Acts 1884–5, p. 101.

Affidavit to amendment proposed, " as far as he knows," insufficient. *Ibid.*; Acts 1880–1, p. 174.

Fraud, Code, §2751; Twyne's case, 2 Co., 81 (b); Waite Fraud. Conv., §320; 6 *Ga.*, 103; 10 *Id.*, 242; Code, §2201; 54 *Ga.*, 635, 639.

Preferences, assignments giving, are not favored, 11 Wend., 216, 217, 218, 226; 1 Am. Lead. Cas. (Hare & Wall.), 86, (side p. 75), and citations; 17 N. Y., 22, 24, 25· Burr. on Ass., §163; Acts 1880–1, p. 124 (*ut sup.*).

Lien or judgment not necessary under acts 1884–5, p. 101, sec. 4.

Cases under old insolvent law and other sections of Code,

distinguished, 12 *Ga.*, 118; 54 *Id.*, 501 (See 2 h. n.), and Code, §1952; Code, §3502 (see 71 *Ga.*, 106, and preface to revised and annotated edition of Code,—Code 1882, (addenda) p. ix., lower portion of page.)

Assets estimated in excess of debts, fraudulent, 1 Sand. Ch., 49; 95 Ill., 498.

Receiver should be appointed, Code, §1946; Acts 1884–5, p. 101, secs. 4, 5; 42 *Ga.*, 46; 10 *Id.*, 274 (h. n. 7, 9, 10).

Can first assignment be set aside by assignor and assignees? 4 Penn. St., 274; 37 Barb., 621; 9 N. Y., 142; Acts 1884–5, p. 101, sec. 5.

HALL & HAMMOND; JAS. R. GRAY; E. J. REAGAN, for defendants, cited as follows:

Re-assignment made, where first was void, 6 Paige Ch., 577; 2 Edw. Ch., 289; 23 Md., 173; 17 Wis, 191; 54 *Ga.*, 501; 39 N. Y., 369; Acts 1884–5, p. 100, secs. 1, 2.

Amendment of schedule, right of, Code, §3502; 12 *Ga.*, 118; Code, §3504; 46 *Ga.*, 461; Burrill on Ass., secs. 263, 361 (4th ed.); 54 *Ga.*, 501.

Unintentional omissions not avoid assignment, 85 N. Y., 464; 76 Ind., 28; N. Y. Laws 1877, p. 543; Rev. Stat. Ind., §§2662, 2663.

Omitted assets pass under general words, 17 N. Y., 470, 60 *Id.*, 185; 62 Ala., 243; Waite Fraud. Conv., §343.

Receiver not appointed, 42 *Ga.*, 126; 56 *Id.*, 144, 611; High on Rec., 27, and citations, 271; Bump. Fraud. Conv., 533–4, and citations; 42 *Ga.*, 46.

Policy of state as to assignments, Acts 1818; Acts 1865–6; 70 *Ga.*, 293; 38 *Id.*, 245.

HALL, Justice.

Owing to the practical importance and widely extended application of the principles involved in this and two other records returned to the same term of this court, to the mercantile and commercial affairs of the community, we have postponed their determination, that we might have

time to consider them maturely, and now present the result of our deliberations, without further apology for a delay which seemed to us necessary for their elucidation.

1. The first section of the act of the general assembly, .approved September 28, 1881, requires that, in voluntary assignments by insolvent debtors for the benefit of creditors, the assignor shall, in all cases, prepare and attach to the deed, or instrument by which the assignment is made, "a full and complete inventory and schedule of all the assets of every kind, held, claimed or owned by such insolvent person, firm or corporation at the time of the execution of such deed, or other instrument of assignment, which inventory or schedule shall be sworn to by the person making the assignment, and in case of assignments by firms, the oath may be made by any member of such firm, or in cases of assignments by corporations, by the chief officer of the corporation;" and it is thereby further enacted (§2) that the affidavit therein previously provided for may be made before the officer in whose presence the deed of assignment is executed, and that the person or persons making such affidavit shall, upon indictment and conviction for filing a false, deceptive or incomplete schedule of assets, be liable to the pains and penalties prescribed by law for persons convicted of perjury, and that no deed or other instrument of assignment by insolvent persons, firms or corporations shall be valid, unless accompanied by the sworn schedule required by the first section of the act. Acts 1880 and 1881, p. 174; Code, Add., p. x., §1953 (d), (e).

In addition to the protection afforded to creditors against partial assignments by insolvent debtors, and to prevent them from suppressing or misrepresenting the extent and character of their liabilities, the legislature, by an act approved the 17th of October, 1885 (Acts, p. 100), declared, §1, that, "in all cases of voluntary. assignments," made after the passage of the act, "by failing or insolvent debtors for the benefit of creditors, it shall be the duty of the person, firm or corporation making such assignment to

prepare and attach to the deed, or instrument by which such assignment is made, at the time of executing the same, a full and complete inventory and schedule of all indebtedness of every kind of such insolvent person, firm or corporation at the time of the execution of such instrument or deed of assignment, which inventory or schedule shall set forth in detail the names of, the amounts due to, and the residence of each of the creditors of such assignor, and which inventory or schedule shall be sworn to by the person making the assignment;" and in case of assignments by firms, etc., shall be sworn to by a member thereof. Section 2 declares, "that no deed or other instrument of assignment by insolvent persons, firms or corporations shall be valid, unless accompanied by the sworn schedule required by the first section of this act." The assignment in question was made after this last act went into effect; and the uncontradicted averments in the bill, which were fully sustained by the proof, show that there were omissions of assets, as well as creditors from each of the sworn schedules attached thereto; but to this it is replied, that the creditors omitted were only such to an inconsiderable amount, as compared with the entire amount of assignor's indebtedness; that it was doubtful, at best, whether some of them were creditors at all, and that the assets omitted from the other inventory were trifling in value and amount, and were omitted from oversight and forgetfulness, without any intention whatever, on the part of the assignor, to palm off a false, deceptive or incomplete schedule, as was evident from a general clause in the deed of assignment authorizing and empowering the assignees to take, hold and recover, not only the property and assets embraced in the schedule, but everything else belonging to the assignor at the making of the deed; and in addition thereto, the assignor, upon discovering the omissions, stood ready and willing to supply them by an amended schedule duly verified, and actually did so.

We have held that the act of 1881 is a remedial statute,

and should be strictly construed as against the assignor and his assignee, and liberally in favor of creditors. *Crittenden Bros. et al. vs. Coleman & Co. et al.*, 70 *Ga.*, 293; *Coggins vs. Stephens & Co.*, 73 *Ga.*, 414. The act of 1885, being of the same character as the other act, and being in furtherance of the same policy, is subject to the same rules of construction. It is true, that in the first of the cases above cited, the schedule was made subsequently to the execution of the deed of assignment, and instead of being attached, was loosely folded away with it; in the other case, there was no attempt to make out and attach any inventory or schedule whatever. In point of principle, we can see no difference between these cases and one in which the schedule, made out and attached, is neither " full " nor " complete." The purpose the act was intended to accomplish, and the rights it was designed to secure to creditors by affording them facilities to detect and expose fraud in such transactions, as clearly set forth by the court in its opinion in the first of the above cited cases, will condemn such schedules as those now under consideration, as well as that then passed on. The difference between a schedule which is not full and complete and no schedule at all is a difference in degree only, and should not vary the application of the rule prescribed by the statutes.

2. For the first time, we are asked to lay down a rule as to what may be safely omitted from such schedules, either by oversight or inadvertence, and without any intention to do so on the part of the assignor, or purpose to mislead creditors by filing a false, deceptive or incomplete schedule.

From the very nature of the subject, it is impracticable, if not impossible, to lay down any rule upon that subject. Generally speaking, the requirements of the law and the conditions it prescribes should be closely followed; at least an honest effort should be made to carry it fully into effect according to its purport and intent. While the omission of some slight and unimportant article of little or no value from the schedule of effects, or some one or more creditors

whose claims amounted to a trifle, and which would be probably overlooked or forgotten by the most careful, deliberate and painstaking person in preparing his schedule, might not have the effect of invalidating the assignment, yet in a case where one party claimed that assets amounting to nearly three thousand dollars were omitted, and the assignor conceded, after these omissions had been brought to his notice by the evidence adduced on the trial, that assets, to the amount of nearly thirteen hundred dollars, had been omitted from one schedule, and sundry creditors, whose undisputed demands were shown to aggregate more than $1,000, were omitted from the other, and sought to supply the omission by then amending his schedules in both respects, we think that the consideration pressed would hardly avail to maintain the assignment. In point of fact, we know that these assignments, especially where they contain preferences to certain favored creditors, are hurriedly made up and executed, especially since the passage of the act by the same legislature which passed the assignment act of 1881, and which was approved on the same day that act was approved, which enables the holder of any matured debt against trading corporations, or traders, or firms of traders, where he has made a demand for his debt and payment has been refused, to file his bill and have the assets of his debtor placed in the hands of a receiver for collection, and which prohibits a creditor, after the appointment of a receiver, from acquiring a preference by judgment or lien, on any suit or attachment, under proceedings commenced after the filing of the bill, and declaring that all mortgages and assignments executed after that time to pay or secure existing debts shall be vacated, etc. Acts 1880 and 1881, pp. 124, 125. Code, §§3149(a) to 3149(g). The haste resorted to in this case is probably deducible from the fact that an assignment was executed between these parties only a short time before that in question was made, and which, owing to their ignorance of the act of 1885, contained no schedule of creditors,

and fearing the appointment of a receiver by some disappointed creditor when this was discovered, they lost no time in vacating that and in hurrying up the other. This may not be so, but the attending circumstances might render this view not altogether improbable.

3. We cannot agree with the ingenious view, so urgently pressed and plausibly maintained by the eminent and able counsel for the defendants, that unless these omissions of assets and creditors were intentional, and designed for the purpose of making the schedules false, deceptive or incomplete, they would not avoid the assignment. It is true that such design, purpose or intention is a pre-requisite, by the act of 1881, to the indictment of the person or persons making the affidavit to the schedule of assets, in order to subject him or them, on conviction, to the pains and penalties of perjury. Usually in proceedings against a person for violating a criminal or public law, it is essential, in order to sustain the indictment, to prove both the act and guilty intent of the accused; for a crime or misdemeanor consists in a willful violation of the public law. in which there must be a union or joint operation of act and intention, or criminal negligence. This is the rule for determining the affiant's liability on a criminal prosecution. Not so, however, where the question in issue is the validity of the assignment. This criminal clause is not in the act of 1885, which provides for the schedule of creditors, but both acts declare, in unmistakable language, that, unless these schedules are "full" and "complete," the assignment shall not be valid. No provision is made by either of them for perfecting a schedule which is not "full" or "complete," and by that means upholding the assignment.

That this course has been pursued in some of our sister states, notably in New York, Indiana, and perhaps others, under their peculiar statutes, we are well aware. In those states insufficient assignments may be completed at the instance of the assignor, or the assignee, or the court to which they are returned, and in some of them on the application of

the creditors. This is a matter of statutory regulation (and may be, perhaps, a good one); at all events, these courts find express authority for their judgment in the provisions of their own state statutes. There are no such provisions in our law, and until the legislature shall so authorize us, we must decline to exercise the power of allowing these schedules to be amended. This would be too great a stretch of judicial legislation for any court to venture on; it would not be a legitimate exercise of power in construing or interpreting a legislative act, but an addition to one by the arbitrary action of the court.

. 4. The general clause in the assignment, conveying to the assignee such property of the assignor as was left out of the schedule of assets, so far from sustaining the position of counsel for which it was invoked, is rather adverse to it; at all events, it contravenes the policy of the legislature in enacting the laws in question, as was clearly indicated by this court in its judgment rendered in the case of *Crittenden Bros. et al. vs. Coleman & Co., ut supra.* The law looks with distrust upon such sweeping clauses in deeds, especially where particularity of detail is required. Ever since Twyne's case, it has been, if not a recognized axiom, at least a well-settled principle that "fraud lurks in generalities."

5. In concluding what we have to say on the law of this case, it may be well to remind the profession and the commercial community that, while preferences in assignments are allowed, they are tolerated rather than encouraged, as is manifest from the drift of our legislation from 1881 down to the present day. The principle here announced is emphasized by the acts above cited, and this provision of the act of 1885, to-wit, "No assignment shall be set aside, except upon a direct proceeding filed for the purpose, and no creditor of the assignor shall obtain any priority or preference of payment out of the assets assigned on any judgment rendered after the filing of the bill, in case the deed of assignment is set aside and decreed to be void." The

act goes further, and carries fully into effect the policy proclaimed in sections 1945 and 1946 of the Code, as well as in art. 1, §2, par. 6 of the constitution of 1877 (Code, §5023), by throwing wide the doors of the court of equity to creditors of every class and description, whether they have a lien or not, and inviting them to enter and avail themselves of its remedial process and aid, that facilities may be afforded them to "detect, defeat and annul any effort to defraud them of their just rights," and that they may be enabled to reach the property "concealed" from them by their debtors.

Each of the positions taken in this case will be amply sustained by the authorities cited in the able and exhaustive briefs of counsel, found at the end of the reporter's statement. As there must be a reversal of the decretal order excepted to in this case, it is certainly unnecessary, and might be improper, to pass upon the other questions made, at least so far as they affect the rights of contesting creditors to the property assigned, and the equities which may exist between themselves and others. The deed of assignment must be set aside for the reasons already given; and that the fund may be preserved for future adjudication and distribution among those who shall appear entitled to it on the final hearing of the bill, the injunction must be ordered and the receiver appointed, as prayed, and upon such other terms as may appear equitable and in accordance with law.

Judgment reversed.