## Ryan *v.* Kingsbery, receiver, *et al.*

1. Where the judgment appointing a receiver and granting an injunction is brought to the Supreme Court by a fast bill of exceptions under the act of 1870 (Code, §§3211 *et seq.*), *no supersedeas* results from filing the bill of exceptions and making an affidavit of inability from poverty to pay costs and give security, the statute declaring that "'no such writ of error, or other proceeding for the obtainment of the same, shall have the effect to establish or deny any injunction independently of the order of such judge," and providing that the judge shall "make such order and require such bond as may be necessary to preserve and protect the rights of the parties until the judgment of the Supreme Court can be had." There being no order of *supersedeas*, the pendency of the writ of error in the Supreme Court is no obstacle to proceeding below with interlocutory matters in all respects as if no writ of error had been sued out.

2. There being provision in the act of 1889 for bringing to this court a brief of the evidence, but no provision for bringing up evidence not briefed, the court will not, over objection of counsel for the defendant in error, review the evidence where it appears on the face of the bill of exceptions that no *bona fide* attempt has been made to comply with the statute by making out a proper brief of the evidence, but a large part of the same has been brought here in full without eliminating the formal, immaterial and irrelevant parts of documents and affidavits. It results from this that the finding of the judge as to the amount of money in the hands of the defendant is to be taken as correct for the purposes of this writ of error.

3. In a creditor's suit under the insolvent traders' act, the judge of the superior court, after the appointment of a receiver, has power to order the defendant to deliver to such receiver all his assets, including money; and upon failure to comply with the order, after demand duly made, the defendant is subject to be attached for contempt for disobedience in not delivering up a specific sum of money found and adjudged to have been in his hands or under his control at the time demand was made upon him by the receiver. Imprisonment by virtue of such attachment is not imprisonment for debt, but for contempt of a lawful judicial order.

4. No error of practice was committed in the proceeding for contempt.

November 23, 1891.

Practice. *Supersedeas.* Brief of evidence. Debtor and creditor. Insolvent trader. Contempt. Imprisonment. Constitutional law. Before Judge GOBER. Fulton county. At chambers, July 28, 1891.

Reported in the decision.

JOHN L. HOPKINS & SON, ALBERT H. COX and WALTER R. BROWN, for plaintiff in error.

CALHOUN, KING & SPALDING, N. J. & T. A. HAMMOND, ROSSER & CARTER and others, *contra.*

LUMPKIN, Justice.

1. On July 2d, 1891, the receiver presented to the judge below his petition, alleging that Ryan had refused to deliver his money as required by the court's order, and praying that he show cause why he should not be attached for contempt. He was ordered to show cause on July 6th, but the hearing was postponed from time to time till July 16th. On that day, while petitioner's counsel were introducing testimony, objection was made to further proceedings being had upon the receiver's petition, because in the case of *Wise et al.* v. *Ryan et al.,* wherein the receiver was appointed, a bill of exceptions assigning such appointment as error had just been filed, accompanied by an affidavit made by Ryan of inability, from poverty, to pay costs and give security for the eventual condemnation money. It was contended there, and insisted upon here, that this bill of exceptions and pauper affidavit, operating as a *supersedeas,* suspended all further proceedings until the decision of that case by this court. Counsel for defendant in error, among other things, say that inasmuch as the hearing for the alleged contempt had begun before the bill of exceptions was presented, the court had already acquired jurisdiction of the contempt case, and therefore had the right to proceed to judgment thereon, irrespective of the bill of ex-

ceptions. Without stopping to discuss whether or not the point thus made is well taken, we will at once pro-. ceed to consider the question of *supersedeas* upon its merits.

If section 4263 of the code is applicable, the contention of counsel for plaintiff in error is unanswerable. But in our opinion, that section does not apply to cases which are brought to this court under the act of 1870, prescribing "the practice in cases of injunctions and other extraordinary remedies in equity, and the manner of taking judgments on the same to the Supreme Court." That act expressly applies to cases involving the appointment of receivers, and provides for what are called "fast" bills of exceptions. It also substitutes for the ordinary *supersedeas* a method of its own for preserving and protecting the rights of the parties pending a review by this court of judgments in cases covered by its provisions. As will be seen from the words of the act quoted in the first head-note, it is made the duty of the judge to pass such order as may be necessary for this purpose. It seems clear that this plain mandate to the judge is certainly inconsistent with the idea that a *supersedeas* in cases of this kind can be obtained in the ordinary way. If a *supersedeas* could be thus obtained as a matter of right, there would be little or no occasion for the judge to pass any order at all in the premises; and if he undertook to do so, his power as to the terms of the order would necessarily be very limited. This, we are sure, was not intended by the act. On the contrary, its purpose was to enlarge the power of the judge in this respect and vest in him a wide discretion. Doubtless the legislature had in view the infinite variety of facts and conditions arising in these cases, and the consequent difficulty of making an uniform rule as to *supersedeas* that would operate justly and fairly in all of them. Slight reflection will suffice to show that what

would be a proper order in one case would not be so in another. Therefore the law gave the judge the authority to make, and imposed upon him the duty of making, whatever order he might deem best in each case according to its own peculiar facts and circumstances, and in so doing, necessarily took cases of this kind from under the operation of section 4263.

In *Hayden* v. *Phinizy*, 67 *Ga.* 758, exception was taken by Hayden to an order imprisoning him for violating an injunction, and the question was raised in this court whether or not such a case could be brought here upon a " fast " bill of exceptions. This court held it could, and one of the main reasons given by Chief Justice JACKSON for this conclusion was, that to hold otherwise would allow the defendant to violate the injunction for months " by getting the *supersedeas* of the judgment below allowed by law until the final decision of this court," evidently meaning that if. the case came up under the general law, a *supersedeas* could be obtained as a matter of right by complying with the terms thereof, but that if it came up under the act of 1870, no such result would follow.

After a careful examination of *W. & A. R. R.* v. *The State*, 69 *Ga.* 524, cited by counsel for plaintiff in error, we are satisfied that no ruling therein conflicts with our judgment in the present case upon the question of *super-sedeas*. That was a *quo warranto* case. The act of 1871 (Acts 1871–2, p. 41) now incorporated in the code, sections 3206 *et seq.*, prescribes the practice in *quo warranto* cases; and while it adopts some of the provisions of the act of 1870 touching the tendering and signing of bills of exceptions, and the docketing and hearing thereof in the Supreme Court, it does not adopt the provisions now embraced in section 3212 of the code. It would seem, therefore, that in *quo warranto* proceedings there is no law authorizing or requiring such an order as that

which the judge under the last section mentioned must pass on rendering his decision upon an application for injunction or receiver, and hence, in such proceedings, *supersedeas* must be obtained under the general law in section 4263. Under the code, a bill of exceptions could originally be taken only as to judgments making "a final disposition of the cause." See section 4250, and the numerous cases there cited. In cases thus disposed of *supersedeas* was had by complying with the requirements of section 4263. In this connection attention is called to the language of Brown, C. J., in 40 *Ga.* p. 315, in *Nacoochee H. M. Co.* v. *Davis, Judge*, wherein this court first held that an interlocutory judgment in an injunction case could not be brought here before the case was finally disposed of in the court below. This, of course, was changed by the act of 1870. Indeed, it was passed for this very purpose. But it is unquestionably true that even since the passage of that act the only way to supersede a judgment finally disposing of a case in the court below is that prescribed in section 4263. In the opinion delivered by Judge Tompkins in the case cited from 69 *Ga. supra,* he says that no bill of exceptions can be taken in a *quo warranto* proceeding *till after the final determination of the whole cause,* and he also states that "bond was given by the defendant railroad company, in accordance with section 4263 of the code, to supersede the judgment of the court below." These statements must be kept in mind whenever the question of *supersedeas* is dealt with in the case, and from them it is evident that the court did not regard the case as one in which the special order provided for by section 3212 of the code could or should be passed, but on the contrary, treated it as one to which section 4263, as to *supersedeas,* was applicable. Thus understood, the 5th head-note and 5th division of the opinion simply rule that where the judge has signed a general bill of exceptions (whether prop-

erly or not), *and supersedeas has been lawfully obtained*, he has no further authority over the case till sent back from the Supreme Court.

In *Cummings v. Clegg*, 82 *Ga.* 766, Chief Justice BLECKLEY, notwithstanding the general language used in the opinion just mentioned, expressed a doubt whether in applications for extraordinary remedies, such as injunctions, etc., a *supersedeas* could be obtained without a special order for that purpose. He did not analyze the opinion, as we have attempted to do, nor was it necessary, as an examination of the case then under consideration will show, but the expression of that doubt was almost equivalent to a statement that he really thought such a special order would be necessary to obtain a *supersedeas* in the class of cases indicated, and he now fully concurs with us in so holding. We will remark, in passing, that by referring to section 3206 of the code, he included, among the extraordinary remedies in which such special order might be necessary, writs of *quo warranto*, but this was a mere inadvertence, there being no question then before the court as to whether such writs should be so included or not.

Another case cited by counsel for plaintiff in error was *Howard v. Lowell Machine Co.*, 75 *Ga.* 328. In that case, however, Justice HALL says, in effect, that the decision excepted to *must have been superseded* in order to take the case from the cognizance of the judge below, and this sustains our present ruling that the absence of a proper *supersedeas*, in the nature of an order provided for by section 3212, left the case still under the control of the court below. When a *supersedeas* has not been obtained, although it might have been by taking the proper steps, the other party may go on with the case at his pleasure, taking the chance of an affirmance, and the risk of a reversal. BENNING, J., in *Jordan v. Jordan et al.*, 16 *Ga.* 452. See, also, *Truluck v. Peeples*, 1 *Ga.* 1; *Allen v. Mayor, etc.*, 9 *Ga.* 286; *Irwin v. Jackson*, 34 *Ga.* 101.

Counsel for plaintiff in error also cited *Perry* v. *Central R. R.*, 74 *Ga.* 411, *Marshall* v. *Livingston*, 77 *Ga.* 21, and *Scott* v. *Central R. R., Id.* 450. These cases merely rule that when a judge has once signed a bill of exceptions, his power over it is exhausted, and that he cannot afterwards modify it or certify another bill of exceptions in the same case. Justice BLANDFORD's remark in the *Perry* case, *supra*, that "when a bill of exceptions is signed by the presiding judge, the writ of error is thereby completed, and further jurisdiction of the case is lost by the superior court and passes to this court," must be restricted to its evident meaning, viz. that the judge had no further jurisdiction *to certify a bill of exceptions* in that case. If held to mean more it would be a mere *dictum*.

The foregoing would, we think, justify the conclusion that the superior court of Fulton county would not, by the mere filing of said bill of exceptions, without a special order suspending further proceedings, have been prevented from proceeding even to final judgment in the case of *Wise et al* v. *Ryan et al.* We only rule, however, that the pendency of the writ of error in this court, under the facts stated, was no obstacle to proceeding below with interlocutory matters. To this extent we are sustained in principle by *May* v. *Printup*, 59 *Ga.* 128, 134, 135. There might be more reason and propriety in allowing the court below to take suitable steps, and pass necessary orders, to secure, preserve and protect the property in litigation, than to make, under the circumstances, a final judgment. Be this as it may, if it could lawfully do the latter, *a fortiori* it can certainly do the former.

2. The act of 1889, prescribing the manner of taking cases to the Supreme Court, plainly enacts that *no case* shall be taken to said court *except in the manner therein provided*. When the case is not one in which a motion

for new trial is to be reviewed, the act requires the plaintiff in error to incorporate in the bill of exceptions *a brief* of so much of the written and oral evidence as is material to a clear understanding of the errors complained of, and if none of the evidence is so material, to state this fact. It requires no argument to show that a brief of written and oral evidence does not mean *all* of such evidence. The word "brief" necessarily implies that there must be condensation of the evidence so as to retain only the material parts.

The same legislature which passed the above recited act passed another (Acts of 1889, p. 119) defining what the meaning of the words "brief of evidence" in motions for new trial should be. Of course, a brief of evidence is the same thing, whether filed with a motion for new trial, or incorporated in a bill of exceptions when there is no such motion. All concerned ought to be familiar with legislative acts relating to such important matters, but the terms of the one last mentioned are so pertinent to the question with which we are now dealing, we consider it proper to state fully what it provides. It enacts: " That the brief of evidence required in all motions for new trial shall be a condensed and succinct brief of the material portions of the oral testimony, including therein a similar brief of interrogatories read on the trial. In such brief of the evidence there shall be included the substance of all material portions of all documentary evidence; *provided*, that all documentary evidence copied as an exhibit or set out in the pleadings and introduced in evidence, shall not be set out in the brief except by reference to the same. In all cases in which the testimony has been stenographically reported, the same may be reduced to narrative form, or the stenographic report may be used in whole or in part in making up the brief, but immaterial questions and answers and parts thereof stricken. The

intention being in every case, as far as possible, to shorten the brief, and to include therein only material portions of the evidence." In most, if not in all cases, both documents and the testimony of witnesses may be considerably abridged without detriment to the party seeking to review a judgment of the trial court. That they could be to some extent abridged, the Supreme Court practice act manifestly contemplated; and that this must be done it expressly declares. At any rate, there should, at least, be a *bona fide* attempt to comply with the statute in this respect; and if the plaintiff in error fails to make a reasonable effort in this direction, thus disregarding the plain mandate of the law, he ought not to complain that this court declines to consider evidence in the bill of exceptions not briefed at all, especially where it is utterly unnecessary to set it out in full. In the present case there was a manifest want even of intention to make a brief of the evidence. The testimony introduced before the judge below consisted mainly of mortgages, other documents and affidavits, and covers more than two hundred pages. Most of these papers were set out in full, including the formal, immaterial and irrelevant parts, which could be of no possible service, but on the contrary would be a hindrance, to this court in reviewing the findings of the judge on the issues of fact presented. It is true the bill of exceptions shows that some agreements of counsel as to what appeared from certain documents and records were used in lieu of the documents and records themselves, but this was done before the judge below, and therefore cannot be fairly counted as an effort at briefing the testimony for insertion in the bill of exceptions. It is also true that in a few instances the substance of papers introduced before the judge is briefly stated in the bill of exceptions; but viewing as a whole the evidence contained therein, it could in no fair sense, or with any degree of accuracy,

v 88-24

be called a "brief of evidence." Not one of the skillful
and able counsel for plaintiff in error could have failed,
if he had so attempted, to reduce this vast mass of testi-
mony to one half, or even less, of its present dimensions,
and still retain all of it needful for the purpose in hand.
Indeed this would have been an easy task for an at-
torney far less competent and experienced.

It does not appear that the judge certified this evi-
dence was a brief or approved it as such. The certificate
to the bill of exceptions, being in the prescribed form,
does say it contains all the evidence material to a clear
understanding of the errors complained of. This may
be, and doubtless is, perfectly true; but it is entirely con-
sistent with the fact that the bill contains, as it does,
much evidence that is entirely immaterial. In preparing
a bill of exceptions of this kind, counsel should either
make out a brief of the evidence and have it approved
as such by the judge before incorporating it in the bill
of exceptions, or it should appear from the evidence
itself in the bill of exceptions that *it is* a brief, or at least
that there has been a *bona fide* effort to make it one.

When this case was reached in its order, counsel for
defendants in error moved to dismiss the writ of error
on the ground that the evidence contained in the bill of
exceptions was not a brief of evidence as required by
law, and that this court could not, therefore, consider it.
The motion to dismiss was denied, because there were
questions made by the bill of exceptions which could be
passed upon without reference to the evidence; but we
ruled we would not, over objection of defendants' coun-
sel, review the evidence or pass on the questions of fact
decided by the judge below. Our refusal to do this is due
to the failure of plaintiff in error to bring the evidence
here in the manner prescribed by law. This point was
distinctly made and insisted upon by counsel for de-
fendants in error; and the objection being in our opinion

well founded, no course remained open to us but to sustain it. It followed, of course, that in our further consideration of the case we took as correct all findings of fact by the judge below, including that wherein he adjudged that Stephen A. Ryan had in his hands at the time the demand was made upon him by the receiver for his assets, $120,490.79 in money, and that said Ryan, in disobedience of the court's order, was withholding the same from the receiver. In a matter involving such serious consequences, a judge ought to take *the greatest possible care and pains to be perfectly sure he is correct in his conclusions of fact.* He should most earnestly guard against all mistakes or miscalculations. Upon him mainly the responsibility rests of ascertaining the exact truth, for if we were actually reviewing his findings, errors of fact would, under our system, have to be plainly apparent before we would be authorized to so declare. We doubt not that Judge GOBER felt this responsibility and acted accordingly. We certainly have no reason even to conjecture that his findings are incorrect.

3. Assuming then, as a fact established beyond controversy, that Ryan actually had in his possession this large sum of money, the naked question is, could the court compel him to deliver it, along with his other assets, to the receiver, to be administered under the court's direction? If the property detained had been a bale of silks, a case of shoes or a bond, it would hardly be denied that the question should be answered in the affirmative. Even if it were a specific coin, or treasury note, capable of description and identification, there seems to be little doubt that the court could compel its surrender. Why, then, should it not have like power over a given and definitely ascertained sum of money in the abstract? Is there any special sacredness about this species of property, or is the fact that the coins, or bills,

or both, composing the sum of money, cannot be accurately ascertained and described, of such great significance as to exempt it from the rule applicable to all other kinds of property ?

It was earnestly contended by counsel for plaintiff in error, in the argument here, that the order of the court requiring the surrender of this money, or upon failure to do so, that Ryan be confined in jail until he did, was imprisonment for debt. There is to our minds a clear distinction between a decree for the mere payment of money, rendered without any regard whatsoever to defendant's ability to pay, and without having previously ascertained that he has the money, and an order made in a proper case directing him to deliver up money conclusively shown to be in his possession. Judgments are rendered every day by the courts in favor of plaintiffs against defendants for money due, irrespective of the fact whether the latter are paupers or millionaires. Refusal or failure to pay such judgments is in no sense a contempt of court, and imprisonment for such failure would be imprisonment for debt pure and simple. There is not the slightest reason to apprehend that any court in Georgia will ever attempt, under our present constitution, to imprison a debtor simply because he does not satisfy a judgment for money against him, or that our constitution will ever be so amended as to authorize or even tolerate such a proceeding. But when our courts are given by an express statute, which is itself in complete harmony with our constitution, as will be hereinafter shown, the power and authority to take possession and control of a debtor's property and administer it for the benefit of his creditors, and a court in the due and proper exercise of that authority ascertains conclusively that a debtor actually has money or other assets in his possession subject to his debts, and orders him to deliver up the same, imprisonment for disobedience to such

order is not imprisonment for debt. It is by no means the case of an unfortunate debtor imprisoned because he *cannot* pay his debts, but that of a contumacious debtor who *will not* obey the lawful orders of the court, though in his power to do so.

We will now examine the act of our legislature under the authority of which the court below acted. It is familiarly known as the "insolvent traders' act" (Acts of 1880–1, p. 124), and was incorporated in the present code, sections 3149a to 3149g, inclusive. Subsequently it was amended by the act of 1889. Acts of 1889, p. 74. As amended, the first section now reads as follows : "In case any corporation not municipal, or any trader or firm of traders, shall fail to pay at maturity any one or more matured debts, payment of which has been properly demanded of such debtor and by him refused, and shall be insolvent, it shall be in the power of the court of equity, under a creditor's bill to which at least three unsecured creditors, or creditors representing one third in amount of the unsecured debts of such insolvent corporation, trader, or firm of traders, whose debts are matured and unpaid, shall be necessary parties, to proceed to collect the assets, real and personal, *including choses in action and money*, and appropriate the same to the creditors of such trader, firm of traders, or corporation."

Section 3149b of the code is in the following language : "The chancellor, under such proceedings as are usual in equity, may grant injunctions, and appoint receivers for the collection and preservation of the assets in the cases provided [for] by this bill [act], and may at any time appoint a master, and take all proper steps to bring the matter to a final hearing ; and the fees of said masters shall not be more than ten dollars per day for each day's actual service."

It will be seen that the court has the power, and it is its duty in a proper case arising under this act, to collect

the defendant's assets, including choses in action *and money*, and to this end may appoint a receiver for the collection and preservation of the assets. Can language be plainer or more unmistakable? The court must, by its proper officer, take possession and control of *all* the defendant's property, *including money*, and administer the same for the benefit of the creditors. See Att'y-Gen'l *v.* Atl. Mut. L. Ins. Co., 100 N. Y. Ct. of Appeals, 279. That the "money" referred to in the act under consideration includes money in the defendant's own possession, there can be no doubt. The act expressly mentions, and provides for the collection of, *choses in action*, which would, of course, cover all money due him on notes, accounts, or other demands upon which he would have the right to sue; and there is no reason whatever to suppose the legislature intended to exclude from the operation of this law so important an item of assets as money actually in the possession, custody or control of the debtor. The use of the word "money," immediately following the words "choses in action," raises the strongest kind of an inference that the word "money" was intended to cover all the money the debtor had, whether in his own possession or that of another; and this inference becomes almost, if not absolutely conclusive, when it is remembered that the act deals with those classes of defendants, including merchants and corpora tions, who are most likely, at all times, to have money on hand in greater or less quantities, and especially so, as the times are, when they are about to fail in business. All these things were doubtless considered by the legislature, and hence our conclusion that the word "money" was advisedly used with the deliberate intention to include among the assets of the defendant of which the court might take possession his money in hand. Any other conclusion, it seems clear, would be entirely unwarranted.

But how is the money to be reached? The act tells us. A receiver is to be appointed to collect and preserve the assets, including, as we have shown, this money. How is the receiver to get the assets which are in defendant's immediate possession? In the usual course of things he demands them from defendant. If defendant refuses to surrender, the court must compel him to do so, and this the court cannot do otherwise than by exercising its power to punish for contempt. If the thing withheld is a box of goods, the court's authority to use this remedy is plain enough. Why, then, under this clear and emphatic law, is it less so when the thing withheld is a given sum of money, *known to be in defendant's possession?* Let it be borne in mind that as this case now stands before this court, we are forced to deal with it as one in which Ryan actually has the money and will not give it up. If our conclusion is not right as to the meaning of the act under consideration, and the method of its enforcement as to money in a defendant's hands, it is in a large measure a vain and unprofitable attempt to remedy one of the very greatest evils at which it is unquestionably aimed, viz. the secretion of his means by an insolvent trader for the purpose of defrauding his creditors. Will it be said that the court is powerless to prevent this, and that its receiver may be laughed at and defied by a fraudulent debtor whose pockets are plethoric with money rightly belonging to others, and who boldly proclaims, "I am protected in the robbery I have perpetrated on my creditors by the constitution of my State!"

As to the power of courts of equity to enforce their orders and decrees, see Code, §§206, 3099, 3237, 4213, 4216 and 4218. In connection with these sections, let it be remembered that whenever the court, by virtue of its authority under the insolvent traders' act, orders the debtor to turn over his money to a receiver, a *duty* is

thus imposed on the debtor by a lawful order, which is essentially different from a mere money judgment or decree to be enforced by execution. In this connection it is also important to remark that *the interlocutory orders* of these courts are never enforced by mere execution. It would, in the nature of things, be impossible to compel obedience to such orders in this manner, and hence the process of attachment is imperatively necessary for this purpose. The case of *Clements* v. *Tillman et al.*, 79 *Ga.* 451, must be considered with regard to its own peculiar facts, and the head-note and opinion construed with reference thereto. There it was attempted to enforce the payment of a *final* decree for money, not only by execution, but by attachment for contempt, and it was properly held, under the provisions of our code, this could not be done. Judge KIBBEE, in delivering the opinion of the court, says : " When a party is decreed to perform a duty or to do any act, other than the mere payment of money, which the court has jurisdiction to adjudge he shall do, if he disobeys, the authority of the court is defied ; he is guilty of contempt, and the arrest and imprisonment of his person is not imprisonment for debt in any appropriate sense of the term. But if a court of equity should render a simple decree for money, on a simple money verdict,—a decree which it may now enforce by the ordinary common law process against property, the failure to pay the decree would not be a contempt, nor could compulsory process against the person of the party in default be resorted to to enforce payment." It is evident from the facts of the case and the context, that in using the words "other than the mere payment of money," he meant the mere payment of money *on final decree.* The court was not considering, and did not intend to pass upon or adjudicate, the question whether or not a court of equity could by interlocutory order put money in the hands of a receiver

to preserve it until it could be ascertained how it should be disposed of. The delivery of money to a receiver for this purpose is not the payment of a debt, or payment of any kind. It is simply an impounding of the money, and does not, of itself, cancel or satisfy any demand or claim against the debtor. The fact that it may, in whole or in part, be ultimately applied to the payment of his debts, does not make turning it over to the receiver a payment of those debts, for it may, and often does happen, that a portion, or all of it, finally goes back to the debtor himself, which is utterly inconsistent with the idea that his original delivery of it to the receiver was a payment of, or upon, said debts. The case just cited, properly understood, is not an authority against our ruling in the case at bar.

It has already been stated that our insolvent traders' act is in complete harmony with our constitution. Special reference was had to art. 1, sec. 2, par. 6 (Code, §5023), which reads as follows : "The General Assembly shall have the power to provide for the punishment of fraud; and *shall provide*, by law, for reaching property of the debtor concealed from the creditor." This paragraph, it will be observed, is found in the "bill of rights." Does not this act provide in effect "for reaching property of the debtor concealed from the creditor?" That it intends to do so can scarcely be doubted, and the case at bar affords at once a striking illustration of the necessity for such a law, and the propriety and justice of its enforcement. In *Hood* v. *Perry et al.*, 75 *Ga.* on page 312, Mr. Justice HALL says this paragraph of the constitution "confers upon the legislature power to provide for the punishment of fraud, and declares in unmistakable and unequivocal terms that it shall provide by law for reaching property of the debtor concealed from the creditor. This fortifies existing legislation upon the subject, which directs the courts to favor the rights of creditors, and to

afford them every remedy and facility to detect, defeat and annul any effort to defraud them of their just rights." The act we are discussing is on this line, and should be interpreted in the light of this constitutional provision. Again, in *Turnipseed et al.* v. *Schaefer et al.,* 76 *Ga.* 109, the same able and learned Justice, in commenting upon the act of 1885 relating to voluntary assignments by insolvent debtors and providing that fraud shall avoid the deed of assignment, emphatically reiterates the same doctrine. Especial attention is called to his remarks on pages 133 and 134 of the volume last mentioned.

Construing *in pari materia* the acts of 1881 and 1885, in the light of these decisions, it is safe to say the legislature in passing these acts had in mind the above specified paragraph of the constitution, and it may be fairly invoked to ascertain the true intent and meaning of both the acts.

It has been urged that the insolvent traders' act is a harsh one. Even if this be true, it affords no reason to the courts for refusing to enforce it. In spirit and in purpose it is a wise and salutary law. This is evidenced by the fact that the legislature has permitted it to remain upon the statute books for more than ten years, unaltered except by the act of 1889 already referred to, which to some extent modified and softened its provisions. We leave to our law-makers the question whether or not it needs further amendment. Upon them devolves the duty of deciding this question, and we doubt not they will determine it wisely.

We might safely rest our judgment in this case upon the provisions of this act, construed, as we think may rightly be done, in the light of the constitutional provision cited. But in view of the great importance of the questions involved, we will cite and refer to some of the decisions of this court affording instances where

imprisonment for contempt has been sanctioned as a remedy for compelling the payment of money, stating at the conclusion of this branch of the discussion our purpose in so doing, and will then examine a number of decisions rendered by other courts, which in our opinion throw light upon the subject and sustain the conclusions we have reached.

In *Cobb* v. *Black*, 34 *Ga.* 162, an attachment for contempt in refusing to turn over property to a receiver was upheld as a *remedial* proceeding, and it is worthy of note that a part of the property in that case was *money* in the defendant's hands. In *Remley* v. *De Wall*, 41 *Ga.* 466, which was a bill for account, settlement and dissolution of a partnership, it was held that an order adjudging one of the partners in contempt for refusing to pay over money collected by him and belonging to the firm, and directing his confinement in jail till the same was paid, was proper and did not violate the constitutional inhibition against imprisonment for debt. In *Williams* v. *Lampkin & Co. et al.*, 53 *Ga.* 200, it appeared that the court fined an administrator twenty-five dollars for contempt in violating an injunction, and ordered him to pay over to a receiver $700.00 collected by him from the assets of the estate after the injunction was served upon him, and that he be attached and imprisoned till he paid the same, which action of the court below this court sustained. Again, where property was sold in violation of an injunction, the superior court rightly ordered that the seller return the property, or pay into court the purchase money, or in default thereof, be committed for contempt. *Thweatt et al.* v. *Gammell et al.*, 56 *Ga.* 98 ; *Thweatt et al.* v. *Kiddoo, Judge*, 58 *Ga.* 300. On the same line, *Robinson* v. *Woodmansee et al.*, 76 *Ga.* 830, is a strong case. See, also, the *Tolleson* cases, 83 *Ga.* 499, 85 *Ga.* 171.

The above citations are by no means exhaustive.

Numerous similar rulings have been made by this court, and those given are merely illustrations. It would be a simple waste of time to cite cases showing that the process of attachment for contempt may be used to enforce the payment of money collected by attorneys, sheriffs and other officers of court; to compel defaulting executors, administrators, bank officers and others holding funds in a fiduciary capacity, to deliver up the same; and to enforce judgments for alimony. That this process may be used in such cases as the foregoing, and has never been considered imprisonment for debt, is too well known to both the profession and the public to require argument or elucidation. In the case of *Cobb* v. *Black*, *supra*, the facts are not fully reported, and we are unable to find the original record in the clerk's office of this court. We cannot, therefore, undertake to say with accuracy that the ruling in that case is precisely in point; and as we wish to deal fairly and candidly with the question before us, we will here state that none of the other cases cited in this connection are direct authority for our decision on the question under consideration. These cases sanction the employment of the contempt process where one actually interferes with and prevents the court's officer from carrying out its orders, or where a trust is violated, or where the public policy of the State is to be upheld, and in other causes of like nature. We therefore cite them for two purposes only: first, to show with what jealousy the law requires obedience to the lawful orders of courts, and consequently, as necessary to the preservation of their existence and authority, the great powers conferred upon courts to compel such obedience; and second, that an imprisonment for failure or refusal to pay over money is not necessarily imprisonment for debt, but may be lawful and constitutional in many instances. For these purposes, we think the foregoing citations and references

are both useful and appropriate. There being no Georgia case absolutely in point, it may be profitable to inquire how other courts than our own have dealt with this and similar questions.

A statute of Alabama, authorizing proceedings supplemental to execution, provided that the plaintiff, after return of *nulla bona*, might file a bill alleging among other things that "the defendant has property, money or effects which are liable to the payment of the debt, and requiring the defendant to answer, under oath, what property he has," etc. The statute further provided that when it appeared to the court from defendant's answer, or other evidence, that he had money, property or effects as aforesaid, the court might render a decree requiring him to pay or deliver to the register of the court such money, property or effects as the court should determine ought to be paid or delivered, for the payment of the execution, and conferred upon the court power to compel obedience to this decree by attachment and imprisonment for contempt. In *Ex parte* Hardy, 68 Ala. 303, a majority of the Supreme Court of that State, then composed of three Justices, held that this act was violative of the constitutional provision " that no person shall be imprisoned for debt." The question is elaborately discussed by Mr. Justice Somerville, and by Chief Justice Brickell who dissented. We commend both opinions for the learning, ability and research displayed therein, but in our judgment that of the Chief Justice presents the sounder view of the law, and in this conclusion, as will be shown hereafter, we are sustained by the Supreme Court of Kansas. It would expand this opinion beyond reasonable limits to follow the learned Justices of our sister State through their respective arguments, but we cannot refrain from extracting the following pertinent and forcible language from the opinion of the Chief Justice: " There can be no imprisonment

under it until the court has ascertained that the debtor has money, property or effects subject to the payment of his debts, which for that purpose he ought to deliver, and, of consequence, decrees the delivery. The ascertainment is not made, the decree is not rendered, until the debtor has had full opportunity of contestation and defence. Human wisdom has not, as yet, devised any greater security against wrong and injustice than an investigation before a judicial tribunal, where each party has equal right and opportunity of being heard. Even after the decree for the delivery of the property or effects, the debtor cannot be imprisoned until he disobeys the decree—until, by his own contumacy, he defies, and places himself in contempt of the authority of the court; and the imprisonment can continue only so long as he remains in contempt; obedience to the decree, a delivery of the property, will terminate it at any time. He is his own keeper, carrying the key of his prison, if not in his pocket, in the mere exercise of his own will." We will hereinafter again refer to this dissenting opinion for another purpose.

After imprisonment for debt had been abolished in Tennessee, a statute was enacted providing that " the creditor, where execution has been returned unsatisfied, in whole or in part, may file a bill in chancery against the defendant, and any other person or corporation, to compel the discovery of any property, including stocks, choses in action, or money due to such defendant," and that "the court has power to compel the discovery and to prevent the transfer or delivery of the property, and to subject the same to the 'satisfaction of the judgment or decree, whether such property could, if in the defendant's possession, or with the title vested in him, be levied upon by execution or not." Under this statute it was held in Cresswell *et al. v.* Smith, 8 Lea, 688, that the proceedings thereby authorized could be instituted *against*

*the judgment debtor alone,* and that the chancery court could, by the process of attachment for contempt, compel him to deliver up certain United States bonds in his possession, to be applied in satisfaction of the debt. Judge McFarland delivered the opinion of the court, and although he said, in concluding it, "we are not to be understood as intimating that a bill might or might not be maintained to compel a defendant to discover whether he has money to pay his debt," and although in Webb *v.* Jones, 13 Lea, 200, the same court, referring to the above quoted language, expressly held that money in the debtor's possession could not be thus reached, we think the reasoning of Judge McFarland really establishes the contrary conclusion, and that the decision in the latter case is not consistent with that reasoning. A careful examination of Judge McFarland's opinion will amply justify what we have just asserted. He shows plainly that the statute quoted covered "all property of any character," including money, and concludes without qualification that proceedings under it were effectual to reach property, not only when it was in the hands of persons other than the debtor, but when it was in his own hands. In view of all his statements and conclusions, to which particular attention is invited, we are unable to see how any doubt could have remained that money should be on the same footing as other property, and especially the kind of property involved in the Cresswell and Smith case. We take the liberty of making the following extended extract from the able opinion referred to, because it is pertinent and valuable, and tends very strongly, we think, to prove the correctness of our own conclusion upon the important question with which we are dealing, notwithstanding the fact that the learned jurist, now many years deceased, did not, as he might have done, and as we have done, take the additional step his reasoning fully warranted: "Has the enforce-

ment of such remedies any resemblance to imprisonment for debt, which by our last constitution is prohibited? Under the old writ of *capias ad satisfaciendum*, the debtor might be seized and imprisoned without regard to his means of paying the debt. The law was modified so as to allow him to obtain his discharge by surrendering up his property and showing his inability to pay more, but still an unfortunate man, entirely without money or means of paying his debts, might be, at least for a time, imprisoned. But in a case like this, there is no necessity for imprisonment any more than in any other case where there is willful and contemptuous disobedience of the lawful orders of the court. The property ought to be reached, or part of it at least, if really owned by the defendant and is lawfully subject to the payment of his debts. The defendant is, in the first instance, only required to answer as to his ownership of certain property which is specially indicated in the bill, and as to its location. If he admits that he owns the property, and it is in his possession or under his control, he is ordered to surrender it for the payment of his debts. This is precisely what the law and common honesty requires him to do. If he obey these orders, the court will have no power to imprison him. If he refuse to obey, the court may imprison him, not because he is unfortunately unable to pay his debts, but because he willfully refuses to obey the lawful orders of the court. In all other cases, when the court, in the exercise of rightful jurisdiction, orders specific things to be done, such as the execution of a deed, or the surrender of property by a trustee, etc., the order may be enforced by imprisonment, and such imprisonment is not imprisonment for debt."

A Kansas statute authorizing proceedings in aid of execution provided that in such proceedings " the judge may order any property of the judgment debtor, not exempt by law, in the hands either of himself or any

other person or corporation, or due to the judgment debtor, to be applied toward the satisfaction of the judgment, and may enforce the same by proceedings for contempt, in case of refusal or disobedience." In a case arising under this statute, the judge found that defendant in execution had money in his possession not exempt by law that should be applied to the satisfaction of the judgment, and ordered that it be so applied. The defendant refused to obey this order, whereupon a proceeding for contempt was instituted, and resulted in his commitment to jail until he should comply with the order of the judge which he had disobeyed. On appeal it was insisted that the order was one commanding the appellant to pay a debt, and that to commit him for contempt in failing to obey the order would, in effect, *be imprisonment for debt*. The Supreme Court of Kansas affirmed the judgment of the court below, and in so doing, held the order in question was not an order to pay a debt, but was an order to apply certain property in the possession of appellant to the satisfaction of the judgment against him. State *ex rel*. Burrows, 33 Kan. 10. The Kansas constitution contains the following: "No person shall be imprisoned for debt except in cases of fraud"; but the ruling in the case above cited was not made upon the idea that it was a case of fraud in which imprisonment for debt was authorized by the constitution. On the contrary, the court held squarely that it was not imprisonment for debt at all, and *In re* Burrows, 7 Pac. Rep. 148, the same court, upon proceedings in *habeas corpus*, reviewed and reaffirmed the above decision, and again held that the order imprisoning Burrows was not imprisonment for debt. In the latter case Chief Justice Horton approves the dissenting opinion of Chief Justice Brickell, already herein cited, and adopts therefrom the following: "The imprisonment is not for debt, but for the neglect and refusal to perform

a moral and legal duty, the performance resting in his ability."

In State *v.* Becht, 23 Minn. 411, the relator, a judgment debtor, sought by *habeas corpus* to be discharged from an imprisonment for contempt imposed upon him for refusing to obey an order made upon statutory proceedings supplementary to execution requiring him to deliver up certain property to a receiver, and it was held the imprisonment was not in violation of art. 1, sec. 12, of the Minnesota constitution declaring: "No person shall be imprisoned for debt in this State, but this shall not prevent the legislature from providing for imprisonment, or holding to bail persons charged with fraud in contracting said debt." It does not distinctly appear that the property referred to was money, but Berry, J., says : "In the case at bar the imprisonment is for contempt in refusing to obey an order of the court. It is true that the order relates to the debt evidenced by the judgment against the relator, but this in no way alters the fact that the imprisonment is for the contempt, not for the debt. And the contempt does not consist in the relator's neglect or refusal to pay the debt, but in his disobedience of the order directing him to hand over certain property to the receiver. The fact that the property in question is to be handed over for the purpose of being applied to the payment of the judgment, is in no way important. The commitment is, nevertheless, in no proper sense imprisonment for debt." The language used would seem to indicate the property detained *was money.* Be this as it may, the principle stated is applicable here.

It has been so often held that the payment of alimony in money may be enforced by attachment and imprisonment, and that statutes so authorizing are not obnoxious to constitutional provisions against imprisonment for debt, we do not deem it necessary to cite the cases.

From one of them, however, Pain v. Pain, 80 N. C., we desire to quote the following language found on page 325, because it is pertinent not only to the subject of alimony, but to the general question now under consideration.    Smith, C. J., said : "The order itself is said to be harsh in its mode of enforcing payment, and unauthorized by law.    The allowance is not a debt within the meaning of the constitution, as contended before us, for which punishment is not permitted.    It is an order of a competent court, only to be enforced as are other judicial commands, when necessary, by process of attachment against the person.    The power to award the process is inherent in the court, essential to the exercise of its jurisdiction and the maintenance of its authority.  Without the ability to compel obedience to its mandates—whether the order be to surrender writings in possession of a party, to execute deeds of conveyance, to pay money, as in the present case, or to perform any other act the court is competent to require to be done,— many of its most important and useful functions would be paralyzed."

In Frazier v. Barnum et al., 4 C. E. Green (19 N. J. Eq.) 316, upon proceedings supplementary to execution, authorized by statute, it was held that "Rings and jewelry are not wearing apparel, and are liable for debt; and as it may be out of the power of the sheriff to levy on, or take possession of them, being usually worn on the person, a receiver will be appointed and an order made for their delivery to him."    The law everywhere protects the person of a debtor from what might amount to an assault by the sheriff, but if he has on his person property subject to his debts, he can be made to deliver it to a receiver.    A fortiori, if he has such property concealed elsewhere, he can be made in like manner to surrender it.    We have already endeavored to show there is no sound reason for excepting money from a rule which applies to all other kinds of property.

The constitution of Missouri provides "That impris-
ment for debt shall not be allowed except for the non-
payment of fines and penalties imposed for violation of
law." In Roberts *et al. v.* Stoner *et al.,* 18 Mo. 484, the
question is discussed as to when a writ of sequestration
may issue. We quote from the opinion of Judge Scott:
"A writ of sequestration is a process for contempt, used
by chancery courts to compel a performance of their
orders and decrees. When there is a decree against a
party for the payment of money or to do any other act,
this process cannot issue until he is put in contempt, or
it is shown that process cannot be served. When an
attachment is served and a party refuses to comply, he
is then in contempt. It would seem that a sequestra-
tion, merely to compel the payment of money, cannot
now issue, as imprisonment for debt is abolished. As
process against the body, for the non-payment of a debt,
cannot now issue, there would be no means of putting a
party in contempt. These remarks are only intended
for decrees for the payment of money. When the decree
is *for the performance of acts within the power of a party,* he
may be compelled by sequestration. Such a process
may have been proper, if it had been shown *that Stoner
had the money in his possession and refused to deliver it
up.*" The italics are ours. The above is a strong inti-
mation, if not an express declaration, that compelling
by attachment the delivery of money *shown to be in de-
fendant's possession* would not be imprisonment for debt.
This is the construction put upon this case in 10 Am. &
Eng. Enc. of Law. See, under title "Imprisonment for
Debt," notes to subdivision II, par. 4, "Disobedience to
orders of court," p. 217. This case is there cited, among
others, to sustain the text in that admirable book, de-
claring: "If an order of court directs the defendant to
deliver to the plaintiff or to any other person, such as a
receiver, certain property or money *which is actually in his*

*possession,* he is not entitled under the constitutional provision [against imprisonment for debt] to any immunity from arrest for failure to comply therewith."

Chap. 126 of the Rev. of 1860 of Iowa statutes is identical, in effect, with the Kansas statute above mentioned.   In a proceeding instituted under the provisions of this chapter, one Grace was imprisoned as for a contempt in refusing to obey an order requiring him to deliver up money in his possession to be applied to the satisfaction of a judgment against him.   It was held in this case that the statute conflicted with the constitutional clause preserving inviolate the right of trial by jury, but it was also distinctly held that the proceeding against Grace was not one of imprisonment for debt, though the value of the decision as an authority on this question might be regarded as somewhat diminished, because Wright, J., referring to the provision of the Iowa constitution that "No person shall be imprisoned for debt in any civil action on mesne or final process, unless in case of fraud," said : "The failure of the debtor to surrender his property liable to execution, to the payment of the judgment, might well be such fraud as that, within the meaning of the constitution, he would forfeit his right to claim exemption from imprisonment." *Ex parte* Grace, 12 Iowa, 213.   The same court, however, in a later case, that of Eikenberry v. Edwards, 67 Iowa, 619 (56 Am. Reps. 360); reaffirmed, without qualification, the doctrine that such proceedings were not violative of the constitutional inhibition against imprisonment for debt, thus rendering the Grace case itself an authority of great weight for our present purpose.

In the case of *Comer & Co.* v. *Coates & Co.,* 69 *Ga.,* on page 495, Chief Justice JACKSON quite aptly refers to the insolvent traders' act as "putting a trader in bankruptcy and relieving him from past debts, as far as State legislation can do so."   The act does, in many respects,

resemble the bankrupt acts of Congress. It is, of course, quite imperfect in this regard, because a State legislature has not the power to inaugurate a complete system of bankruptcy; but there is enough similarity between its provisions and those of the Federal bankrupt law to make the cases, *In re* Salkey & Gerson, and *Ex parte* Salkey & Gerson, reported in 6 Bissell, 269 and 280, interesting reading in this connection. Upon the petition of creditors, these parties were adjudicated bankrupts, and an examination of them was had under the provisions of section 26 of the bankrupt act, which confers upon the court the power to examine bankrupts on oath, and also to punish as for a contempt any neglect or refusal to obey any order thereof. It appeared from the examination that the bankrupts, under the firm name of Salkey & Gerson, were engaged in the clothing business in Chicago; that January 1st, 1873, they had a capital of $11,000, owing substantially nothing; that between that time and the filing of the petition in bankruptcy, they purchased goods which went into their store and which had not been paid for, to the amount of $35,000, and that the total assets turned over by the firm to the assignee were not, at the bankrupts' own valuation, worth over $9,000, and no attempt was made to account for the deficiency. The evidence taken before the register on this examination was returned into court, and a hearing was had in which the court, from said proof, adjudged "that said bankrupts had a large amount of assets in their hands during the year preceding their bankruptcy, for which they gave no satisfactory account," and ordered them to appear before the register "and give a true and satisfactory statement and account of the assets of said firm, and what had become of the same, and where they were; and that said statement be given under oath and reduced to writing by the register, and returned to court." They appeared before the reg-

ister and stated under oath that they had no further account to give of said assets. A motion was then made that the bankrupts be committed to jail for contempt "in not accounting for and delivering to their assignees the said deficiency between the assets traced to their hands by their own admissions under oath, and what they had already surrendered." Judge Blodgett, of the district court, granted the motion, and ordered "that the bankrupts stand committed to jail until they shall account for the goods thus traced to their hands," and Judge Drummond, of the circuit court, refused to discharge them upon a writ of *habeas corpus*. In the opinion delivered by the former, he says: "The district court, as a court in bankruptcy, is clothed with all the powers of a court of equity. When a man is adjudicated bankrupt, he is bound to schedule and surrender to the proper officers of the court all his assets. And if it is made to appear to the court by an examination under the 26th section, or in any other manner, that the bankrupt has refused or neglected to surrender any portion of his property which he ought to have surrendered in the first instance, he may be ordered to surrender such property, and if he fails to do so, he may be punished for contempt. And the delegation to the court of power to require an account to be given by the bankrupt of all matters relating to the disposal of his estate, and his dealings with others, and acts concerning the same, implies of itself a power to punish if a satisfactory account is not given. The court, in other words, must be satisfied that the bankrupt has rendered a full and complete account of his property, and given a true statement of the disposal of the same, and if the bankrupt fails to satisfy the court, he is liable to the process for contempt." There is in our "insolvent traders' act" no provision for such an examination as that provided in the bankrupt act, but the defendant is a competent wit-

ness, and may be put upon the stand either at his own
instance or that of his creditors; and moreover, the
court may undoubtedly require him to answer a petition
of the receiver alleging that he is concealing or detain-
ing his assets. Under our act, the court may, beyond
question, also pass all proper and legal orders to effectu-
ate the delivery of the debtor's assets to the receiver,
and enforce obedience to them by attachment for con-
tempt. There is, therefore, considerable similarity be-
tween proceedings of this nature under the bankrupt
law and our act. In neither of them do we understand
that the debtor's answer or statements are to be taken
as final or conclusive, but they may be shown to be false
by other evidence. Judge Blodgett quotes approvingly,
which we think was proper, the following from Ash-
hurst, J., in a case arising under the bankrupt act passed
in 5th of George II: "It would be a ridiculous ceremony
for the commissioners to go through in examining a bank-
rupt, if they were bound to give credit to his account,
however improbable or absurd it might be, merely be-
cause he has the effrontery to swear to it. In these
cases they are to exercise their judgment upon the
whole." And Judge Drummond says, "The court is not
bound to accept his [the bankrupt's] answer that he has
told all that he knows about his property, if it clearly
appears that there is still property unaccounted for."
The judgments in these cases, and the reasons given for
them, strengthen the correctness of our judgment in the
case at bar. We do not rely on them as express author-
ity or assert that they are precisely in point, but they
tend to show we are traveling in the right direction, and
they contain some salutary lessons of honesty and good
morals. For instance, Judge Blodgett, after reciting on
page 278 the facts showing the scheme of these bank-
rupts to defraud their creditors, says: "If ever there
was a case where the circumstances pointed indubitably

to the conclusion that the bankrupts had deliberately and wilfully secreted their goods, or the proceeds thereof, for the purpose of preventing them from coming into the hands of their creditors, this is such a case. And yet, on being arraigned and asked by the court to account for these goods, the bankrupts coolly say they have no further account to give. It seems to me that the court ought not to allow itself and the creditors of these men to be mocked in this way. It ought to compel these men to account for these goods, to tell where they have gone, *to disgorge the proceeds or tell who has them,* in order that the assignee may obtain them, and that not only that justice may be done to the creditors of these bankrupts, but that such high-handed and impudent attempts at swindling may, as far as possible, be prevented in future." And in his opinion refusing to discharge these parties on *habeas corpus,* Judge Drummond uses language equally strong and pungent.

This argument might be expanded into an extended discussion of the inherent powers of courts of equity, and an elaborate inquiry concerning the extent to which those powers may be exercised in compelling obedience to their orders and decrees. The subject is discussed at length in some of the cases we have cited, and in the cases and text-books therein mentioned. The opinion of Chief Justice Brickell, already noticed, will be found exceedingly interesting and valuable in this connection. He gives careful consideration to the question whether or not, in the absence of a statute enlarging their powers, courts of equity have jurisdiction to reach and subject property of debtors other than that which is subject to execution at law, which question, in the case at bar, resolves itself into the inquiry, has a court in Georgia exercising equity jurisdiction the power, without express and affirmative authority *by the letter of the statute,* to

reach money in the debtor's possession? The learned jurist, after citing many cases English and American, and referring to numerous text-books, reaches the conclusion that the weight of authority favors an affirmative answer to the question stated by him, in which view we concur. Special attention is here called to pages 340 to 343, inclusive, of 68 Ala. The determination, however, of the above inquiry, as applicable to the courts of Georgia, is important in the case before us only upon the theory that our insolvent traders' act simply creates a new class of cases in which receivers may be appointed, and adds nothing to the powers already existing in courts exercising equity jurisdiction as to compelling the delivery of property to the receiver, and that if these courts could not, before the passage of this act, compel the delivery of money in a defendant's possession to the receiver, they cannot do so now. Even if this theory be correct, we are of the opinion that such courts in this State, before said act was passed, already had the power, in any case where the appointment of a receiver was lawful and proper, to enforce the delivery to him of money as well as any other kind of property. The sections of our code concerning the powers of such courts, above cited, sustain this view.

There is highly respectable authority for the position that when a receiver is appointed to take charge of assets, *the title* to the property vests in him. In Beach on Receivers, §192, we find the following : "The title of a receiver to real and personal property, . . both in this country and in England, is generally statutory, and does not depend upon any formal conveyance. Where a partnership is in the course of dissolution, and a receiver is appointed of its assets, the receiver *takes the whole equitable title to the partnership property* without an assignment, and represents the interests in such property of all parties to the suit in which he was appointed.

The court, by a proceeding for contempt, compelled obedience to its decree, and prevented an interference with the possession of the receiver." Again, in Gluck & Becker on Receivers of Corporations, p. 18, it is said: " It has been clearly held in well-considered cases that, aside from any statutory provision, a receiver appointed by a court of equity takes, by virtue of his appointment, *title to the personal estate, at least,* of an insolvent corporation," etc. The text of these authorities is supported by Attorney-General *v.* Atlantic Mutual Life Ins. Co., 100 N. Y. 279, already cited. Hence it would seem that a receiver is thus entitled to take possession of the defendant's assets, including his money, upon the idea that the title to the property is vested in him. Such title is, of course, a qualified one, and it must be remembered that the receiver holds as a sort of trustee for the benefit of the party or parties to whom the property really belongs. And it would follow that if the creditors, pursuing a trader under our insolvent act, failed to establish an indebtedness by him to them, the receiver would hold for the benefit of the trader himself, and the property would be ultimately restored to him. These authorities, therefore, tend to prove that ordering an insolvent trader to deliver his money to a receiver, is an entirely different thing from merely ordering him to pay a debt, for it might result, as we have already observed, that the very money he delivered to the receiver would be returned to him, if it should appear upon the final adjudication of the case that he was really not indebted to the plaintiffs at all.

We do not deem it necessary to enter further into a discussion concerning the powers of courts of equity, outside of statutory aid, to compel the delivery of money to receivers, because, in our opinion, there is very strong reason to support the proposition that our insolvent traders' act itself authorizes the seizure, through a re-

ceiver, of money in the defendant's hands. Looking at its plain words and evident purpose; remembering that it is within the spirit, if not the letter, of our constitutional mandate to the legislature to "provide by law for reaching the property of the debtor concealed from the creditor," and bearing in mind that unless this law authorizes the court to compel a trader falling within its provisions to deliver to the receiver all property, including money, *actually in his possession*, the law is imperfect, ineffectual and entirely inadequate to accomplish the very things for which it was designed, we feel assured that our construction of the act and our opinion as to the powers of the court thereunder, are not only correct, but are precisely what the legislature intended and what the constitution sanctions. To hold otherwise would be to strip the act of a large, if not the greater part of its usefulness, and in many cases make it of no practical value whatever. We are fortified in this conclusion by the views and opinions of eminent and learned judges, presiding in other jurisdictions, in construing statutes of a similar nature. What these judges think and have solemnly adjudicated we have endeavored to set forth by copious extracts from their decisions, believing their language to be more forcible and convincing than anything we could substitute therefor.

Our judgment in this case does not, as the able and zealous counsel for plaintiff in error contended, inaugurate imprisonment for debt, nor will the direful consequences foreshadowed in their arguments ensue. God forbid that the day should ever come, and we are perfectly certain it never will, when an honest man in Georgia can be incarcerated simply because he cannot pay his debts! No constitution will ever so ordain; no legislature will ever so enact, and consequently, no court will ever declare that this may be done. The people of this great State may peacefully pursue their occupations,

whether on the farm, at the work-bench, in the store, or elsewhere, undisturbed by visions of jails overflowing with unfortunate debtors imprisoned for failure to pay their debts, and with the fullest assurance that their law-givers and their judges will never suffer the evil day to dawn when such things will be possible. No matter how much they may be oppressed with the burden of *clean* debts, no court would desire if it dared, or dare if it desired, to set up the common jail as the common collector of such indebtedness. Care should be taken to avoid the inexcusable mistake of classing honest debtors who fail to pay only because they cannot, with dishonest debtors who thrive by fraud and conceal the property in their possession from those to whom it really belongs. With the former, not only the courts and juries, but all philanthropists and patriots, will earnestly sympathize, and neither law nor enlightened public opinion, in which the law is born and cradled, will ever permit them to be punished simply because of their misfortunes. It is at the latter, and at them alone, the constitution aims when it says the legislature may provide for the punishment of fraud and *shall provide* for reaching property concealed from creditors. If the act under consideration was not deliberately passed in pursuance of these provisions of our organic law, it harmonizes with them most admirably. It is our sworn duty to uphold it, and by so doing, compel those who grow rich by swindling and fatten by fraud to disgorge their ill-gotten gains, and restore what they have taken from those who trusted them not wisely but too far. No mawkish sympathy for one who buys never intending to pay, and who resorts to disgraceful schemes and dishonest devices to compass great wealth without labor, and to this end conceals the fruits of his fraudulent endeavors from his creditors, should, or will, deter the legislature of this State, or its judiciary, from

their determination to uphold common honesty, and make the courts, not only in theory, but in fact, places where justice is administered.

We have not examined or considered the evidence in this case for the reason, as stated, that it was brought here in such manner *we could not legally do so.* The fault was not ours, and we are in no way responsible for the failure of counsel to bring up the evidence in the way plainly prescribed by law. Accepting then as true, which we are constrained to do, the findings of fact by Judge GOBER, and having reference to his decision and the recitals therein, without looking into the evidence on which it is founded, substantially and in brief the following would appear: A merchant purchases enormous quantities of goods, and becomes indebted about a million of dollars. He proceeds to convert these goods, as rapidly as possible, into cash, having more than one hundred clerks, and his daily sales amounting often to thousands of dollars. The sales continue till the day his store is closed up by the sheriff. When the court's receiver seeks to know what has been done with his assets, and what he has to show for the million dollars of debts, no satisfactory exhibit is made. Checks were destroyed when returned cancelled from the banks; check-books and stubs have disappeared, and cash-books cannot be found. His bank accounts show that during a period of about sixty days before the store was closed, he had deposited to his credit in three banks $268,604.87. He turned over to the receiver $1,007.15, saying it was all he had. He accounts for the immense amounts shown by the bank accounts by alleging the payment of certain debts amounting to about one fourth of the sum of the deposits, and by averring that the sum of these deposits did not truly represent the amount of money he actually had, because, in order to preserve his credit, he had pursued a system of "kiting" his

money about from bank to bank, and this made it seem vastly more than it really was,—in fact he had not more than one third of the aggregate sum of these deposits. He further alleges losses in betting on prize fights in New Orleans, and at horse races, and in the gambling hells of New York, but finally states the money lost in gaming has nothing to do with the case, as no money now sought was thus squandered. His "kiting" theory, upon being probed, is found in many respects untrue, and does not begin to account for the disposition of the money he had, and he has actually in his possession about $120,000.00. Concluding, Judge GOBER says : "There is not amid all this waste of facts and figures a single act on the part of this respondent which shows that it was born of an impulse to treat all of his creditors fairly."

We repeat again we have not been permitted to review the judge's findings, nor pass upon their correctness, nor have we any reason to doubt that they are true. Assuming them to be true, which we must do, there was never a plainer case for the application and enforcement of the process for contempt. Otherwise, a merchant who has credit may buy with no purpose of ever paying, turn the goods into money, put it in his pocket, and when called on by the court to deliver it up, defiantly say, " You cannot make me do so, because it would be imprisonment for debt, which the constitution of this great State forbids." Can the constitution be successfully invoked to protect such transactions ? We think not.                    *Judgment affirmed.*