RYAN *v.* KINGSBERY, receiver, *et al.*

1. According to the principle ruled by this court in *Thweatt* v. *Kiddoo*, 58 *Ga.* 300, after a remedial proceeding for contempt has been reviewed and affirmed by the Supreme Court, all defences or excuses which were or might have been presented are *res adjudicata.* See Com'rs of Wilson Co. *v.* McIntosh, 30 Kan. 234; 1 Freeman on Judg. §326.

2. In the present case, no material matter was presented in the petition for a rehearing which could not have been adduced by the use of due diligence before the judgment attaching the party for contempt was rendered. There was no abuse of discretion in dismissing the petition.

3. Inasmuch as it is contrary to the spirit of the constitution and laws of this State to detain any person in prison who is unable by reason of his poverty to pay money into court or deliver the same to a receiver; and inasmuch as no person should be so detained if there is ground for any reasonable doubt of his ability, the doctrine of *res adjudicata* cannot be invoked or used to make imprisonment perpetual.

4 Exercising the power conferred upon this court by the code, §4284, direction is hereby given to the judge of the superior court of Fulton county that if, in his discretion, he shall think the ends of justice so require, he refer it to a master or auditor to take testimony and report to him as to the amount of money or other assets in the hands or under the control of Stephen A. Ryan, and as to his ability to comply with the order of July 28th, 1891, requiring him to surrender to the receiver the sum of $120,490.79, and that upon reception of the report, the said judge do consider the same and take such action thereon with reference to the discharge or further detention of said Ryan as, in the exercise of his discretion, he may deem consistent with right and law. The inquiry embraced in this direction will be conducted independently of any previous inquiry, and will involve an account of all

money and other assets in the hands or under the control of said Ryan at the time he was attached for contempt and subsequently.

April 27, 1892.                    *Judgment affirmed, with direction.*

Contempt. *Res adjudicata.* Imprisonment. Practice. Before Judge Marshall J. Clarke. Fulton superior court. September term, 1891.

The receiver appointed in the case of L. & C. Wise *et al. v.* Stephen A. Ryan *et al.* brought his petition, in brief, as follows : On July 1, 1891, he demanded of Stephen A. Ryan a surrender, in accordance with the terms of the order appointing him, of all assets of the late business of Stephen A. Ryan and his property of every kind, including moneys, deposits in bank, checks, books, etc. Ryan said to him that he had theretofore surrendered to the temporary receiver all of his assets and had no further surrender to make in compliance with the order, and he made no surrender to petitioner of anything whatever. Petitioner on information and belief charges that, in addition to the assets turned over by Stephen A. Ryan to the temporary receiver, Ryan, at the time of the filing of the original petition in the case, had in his possession or control other assets, money to the amount of $500,000. The facts upon which this allegation is founded are as follows : On August 1, 1889, when Stephen A. Ryan became sole proprietor of the business, according to the evidence on the hearing for receivership, he owned a half-interest in the storehouse in which he did business, estimated by him at $65,000, he owned the original half-interest in the merchandise given him by his father, estimated by him at $75,000, and had up to that time in connection with his brother, John F., earned as his share $64,000 as profits out of the business, making him worth at that time about $204,000. Since that time he has contracted debts for borrowed money, goods, etc., for which he has received full value and for which he still owes, to the amount of

$950,000 and over, making an aggregate of assets of $1,150,000 and over, all of which or the proceeds should have been in his possession or control at the time of the filing of the original petition. But the surrender of assets made by him consists almost entirely of his stock of goods, which, according to the evidence at said hearing, is not reasonably worth more than $450,000, and he turned over in cash only $1,100, thus leaving unaccounted for $700,000 and more, in a business covering only twenty-two months. The further fact shown by the evidence at said hearing is, that Ryan for the past five or six months has been conducting sales of enormous quantities of goods for cash and on credit to solvent customers; from such credit sales there was due at the time of the filing of the petition only about $42,000, most of it collectible. From March 27 to May 23, 1891, Ryan deposited in the Atlanta National Bank, the Gate City National Bank and the American Trust & Banking Company the sum of $292,954.09, all of which has been checked out by him, and not exceeding $10,000 of it paid by him on any debts he owed. In addition to these assets Ryan claims to have sold his half-interest in the storehouse given him by his father, for $65,000, and to have received full payment therefor, thus converting it into a quick asset. The books of Ryan show that he made no bank deposits after May 23, 1891, which was Saturday, and the evidence showed that it was his custom not to deposit receipts of a day's sale until the succeeding day, and thus he has not turned over to petitioner the receipts of the business for Saturday May 23, Monday May 25, nor for the sales up to 11.50 A. M. Tuesday May 26, 1891, during all which time he was selling large quantities of goods for cash, some $12,000 or more in cash for these three days' sales. Since January 1, 1891, Ryan has paid no considerable sum on his indebtedness, has had a fine trade, met with

no business misfortune, and at that time there were no suits pending against him in Fulton county. Wherefore petitioner asks an order requiring said Ryan to show why he should not be attached for contempt for violating and refusing to comply with the order of the court, directing him to surrender said money to the receiver.

This petition was answered by Stephen A. Ryan; and a hearing was had before Judge GOBER, whose dedecision, on July 28, 1891, was, in brief, as follows: It appeared that beside the money turned over by Ryan to the temporary receiver, he turned over a book of Atlanta National Bank checks, the stubs of which for checks used began with 461 and ended with 493, dated May 26, 1891; also a book of checks of Eugene Kelly & Company, from which checks had been used to 949, dated May 24, 1891. The temporary receiver made specific demand for stub-book of checks on the Gate City National Bank, American Trust & Banking Company and Atlanta National Bank from December 6, 1890, to May 8, 1891, and all checks cancelled and returned since August, 1890, to which demand Ryan responded that all checks were destroyed when his books were balanced and the cancelled checks returned to him. Afterwards a permanent receiver made another demand on Ryan, who replied that he had surrendered to the temporary receiver all he had to surrender. In answer to the original bill, Ryan stated that often, in the conduct of his business, it became necessary for him to preserve his credit, and to that end he kept three separate accounts in the banks of Atlanta, and frequently would make deposit of sales for one day in one bank and draw a check upon his deposit in another, and the next day make a deposit in another, drawing his check on one of the other banks, and on the third day make a deposit in another bank and draw a check

upon another, which check or .the amount of it he deposited with his daily sales. In his answer to the receiver's petition Ryan said : It is not true that from March 27th, to May 23, 1891, he deposited the real sum of $292,954.09. In his struggles to pull through a crisis in his business he desired to impress the banks with the idea that he had large sums of money, and hence deposited with three, and on making a deposit would either give a check on another or go to another, draw the money, add the check or the money, or part of them, to his deposit, and sometimes add sums from other sources, and thus increase the size of it. In this way the same money would be often deposited, and the real sum of all said deposits would not amount to more than one third of said aggregate sum. He did make a bank deposit on Saturday, May 23d, and paid all the money he had left, after paying debts hereafter stated, to the temporary receiver. On said Saturday, Monday and part of Tuesday, he did not take in $12,000, but took in about $4,500, and this money and all other that he had was paid out to his employees on May 26, 1891, to John F., his brother, for rent and on notes for borrowed money, May 1st or 26th, $30,722.02, to two other brothers early on the morning of May 26th, before the bill was filed or stock levied upon, $20,000 for borrowed money, and on May 25th to Mrs. Austell $10,000 borrowed money. The books of the banks show that his aggregate deposits from March 27th to May 23d, 1891, all amounted to $268,544.97, but this does not evidence the real sum of money had by him at and between said dates, nor furnish any ground for the inference attempted by the receiver to be drawn, that at the time of the demand by the receiver or at the filing of the creditors' petition, or at any time after that, this respondent had any of said money in his hands or power, possession, custody or control, for at none of said times did he

so have any of such money, and he had none at such times from any source whatever, except such as he turned over to the temporary receiver. For a more complete and perfect understanding of his dealings with said banks he attaches a copy of his account with each of said banks for the period between March 27, 1891, to May 23, 1891. Then followed in his answer specific allegations as to dates and amounts, on and in which he drew from funds on one of the banks and deposited in another, etc., making a statement of forty-six "kites," and alleged that all of the aforesaid sums were redeposited in said banks in connection with and in addition to other sums at the same time deposited and made parts of his deposits. In his decision the judge considers these "kites" and states that there is not in one of them a check, on the deposit tickets, of the amount of the alleged "kite," the checks being in small amounts, just as a retail merchant would get them, and that it followed that the "kite" was deposited in money or invested in another check, and that no bank officer could tell anything about its being a "kite" or where it came from. The judge had examined each of these "kites" as closely as he could, under the evidence, from every possible standpoint, and stated a few of them as illustrations, among others the following : "The respondent's answer says that on May 13th, he drew $2,500 from the Atlanta National Bank; on the same day deposited same with the American Trust & Banking Company. There is no check for $2,500 on this day. There is one for $3,500, so here is $1,000 unaccounted for. The other $2,500 could have been 'kited.' Respondent in his answer says that on April 1st he drew $2,000 from American Trust & Banking Company, redeposited on same day with Gate City National Bank $1,458.75 of this. Now the total deposit for that day was $1,458.75. Of this there was coin $498, and five small checks aggregating $49.75,

and currency $941. To allow this 'kite' would still leave $541.25 unaccounted for; besides there is no room for the 'kite.' Respondent in his answer says that on May 18th, he drew $2,500 from the American Trust & Banking Company and 'kited' it into the Gate City National Bank. Now this amount, the respondent sets up, was drawn from three different banks—the Atlanta National Bank, the American Trust & Banking Company and the Gate City National Bank. On this one item he claims three 'kites,' making $7,500. $5,000 of it is certainly wrong. Respondent in his answer sets up that on April 30th he drew $3,500 from the Gate City National Bank and deposited in the Atlanta National Bank. It turns out that there was no deposit in the Atlanta National Bank on that day, and by amendment he claims that this $3,500 was redeposited in the Gate City National Bank. Taken with another $5,500 that he alleges was 'kited' into the Gate City National Bank on that day, it would make the total 'kite' for that day into that bank $9,000. By going to deposit slips we find that the total deposit for that day was $5,728.23. This is made up of currency, $4,535; twenty-two small checks aggregating $472.72, and the balance in coin. These two 'kites' certainly have many infirmities." After considering and studying respondent's answer the judge was impressed with the belief that respondent had gotten up this bill of particulars by simply taking the records of deposits and amounts drawn from bank, and where opportunity offered and amounts suited, claimed the "kite." Respondent had been required to turn over all his books. He answered he had none of the kind required to make out such a statement, that the checks were destroyed when returned cancelled; and he had either made it out as indicated, or is in contempt for failing to turn over papers demanded. The judge then considered the evidence as to amount of daily sales,

character of the business done by respondent, amount of custom he had and his enormous purchases of goods, and said: "I am impressed with the conviction that respondent's answer cannot be wholly trusted. There is an affidavit in the record, put there as I remember by respondent, showing that about one hundred and ten salesmen were employed; besides these there were numerous helpers. Outside of those who have figured throughout this matter we have but six affidavits as to the amount of daily sales from this respondent, and three of these are from young girls. It would seem that, if all appearances were deceptive, this is a matter that was in the power of the respondent to put beyond controversy." His conclusion was, that the sales were more than twice the amount set up by respondent; that the entire scheme was to get money; that the case was a plain one, and that there was not, amid all the waste of facts or figures, a single act on the part of respondent which showed that it was born of an impulse to treat all of his creditors fairly. It was adjudged that the amount of money which respondent withheld, and which was in his hands at the time of the demand by the receiver, was $120,490.79, and that respondent should stand committed to jail until he purged himself of this contempt and until he complied with the former order for the delivery of his assets to the receiver, the amount of such assets being expressed in this order.

A bill of exceptions was taken, and the judgment was affirmed. 88 *Ga.* 361.

On December 11, 1891, Stephen A. Ryan filed his petition, in substance as follows: Under the order of July 28, 1891, he was committed to jail and there remained until released on bond by order of the court on August 1, 1891. On November 28, 1891, he appeared and surrendered his body to be imprisoned, and since that time has been and still is imprisoned under said

order. He prays to be allowed opportunity to purge himself from said order that he is or has been in any contempt of the court; and prays to be discharged on the following grounds: It is impossible for him to pay the sum of $120,490.79, because he has not that sum or any part of it in his possession, power, custody or control. He has no money and has no means of ever getting any money, except by earning it without capital of his own. He did not have or control said sum or any part of it, or withhold said sum or any part of it from the receiver when the same was demanded of him by the receiver. In support of these grounds he relates the following facts additional to the evidence adduced by him at the former hearing, and avers that by the exercise of the utmost diligence he could not have adduced the same before said order was passed. One of the grounds on which said order was founded was, that although there were so many salesmen employed by petitioner in the conduct of his business, outside of those who had figured throughout the matter there were but six affidavits as to the amount of daily sales, three of which were from young girls, and that it would seem that this was a matter which was in the power of respondent to put beyond controversy. As to this petitioner now says: His store had been closed and he had no longer control of his former employees. They had been discharged, paid off and were scattered. It was impossible for him to locate them all; some had removed. He could not, for the want of time, do more in this respect than he did do at the former hearing. Since the coming in of said order he has succeeded in getting the evidence of a large number, about forty of these employees whose business gave them opportunity of observation and opinion upon said subject, and herewith presents it, to the effect that the sales made by him during the time in controversy did not amount to more

than was set forth in his answer, and could not have produced the sum claimed by the receiver to have been so produced and deposited in the banks in the time stated, but would produce only about the amount shown by him in the former hearing to have been paid out to creditors. Since the rendition of said order he has carefully, with all the memoranda obtainable and with the same desire to be perfectly candid and truthful which he exercised in his answer to the receiver's petition, reviewed the hastily prepared statement he made in his said answer and amendments, as to the sum of money deposited in the banks in Atlanta by him between March 16 and May 23, 1891. He was unable at the time of making the answer and amendments to be more accurate than he was. The transactions which were held by the presiding judge to be the burden of the petition, were vast in aggregate and numerous in detail, and petitioner felt he could not comply with the rulings of the court as to pleading to them in detail in the limited time granted him, and so asked for more time, not in any spirit of delay as obstruction, but purely in order to present the matters accurately. Such time was not granted. Petitioner appends a statement of the moneys drawn from each of the banks and redeposited in the other banks, which is accurate in detail. With it he presents evidence of reputable bookkeepers and others which he prays may be considered, showing that redeposits did exist to the extent claimed by him, which fact he most solemnly and absolutely reaffirms. As the said order was grounded on the finding of the judge presiding against the existence of said redeposits, as appears on the face of the order, he prays that this additional evidence may be considered. It was utterly impossible for him to get the evidence before the rendition of said judgment, for the want of necessary time. In addition to the above, he prays consid-

eration of the evidence of the many witnesses by whom
he has established the existence of said system of
checks and redeposits, which evidence he has obtained
since the rendition of said judgment.   Said order was
improvidently granted, as appears from the face of the
proceedings and from the written evidence, in the fol-
lowing grounds and particulars : The presiding judge,
as a reason and ground for the judgment, stated therein
that on May 13 petitioner drew $2,500 from the Atlanta
National Bank and deposited the same with the Amer-
ican Trust & Banking Company, and that there was no
check of $2,500 on that day.   By reference to the bank
statement of said day it will be found that there was a
check for said $2,500 on that day, and petitioner also
submits an affidavit from the paying-teller of the bank
to confirm the same; and there was on said date no
check for $3,500 as improvidently stated in said judg-
ment.   Regarding the check for $2,000 of April 1, from
the American Trust & Banking Company, the judge
overlooked the fact that the claim that it was a rede-
posit or "kite" had been withdrawn by an amendment
upon the mistake being discovered.   He also improvi-
dently found that petitioner set up that $2,500 of May
18 was drawn from three banks, making $7,500, and
that $5,000 from the above amount was certainly
wrong.   It was not so set up by petitioner.   The order
was granted improvidently on the further reason set
forth therein, that on April 30 petitioner alleged that
he redeposited $9,000 in the Gate City National Bank ;
by amendment then of record said mistake had been
corrected.   Petitioner further shows that since the ren-
dition of said judgment the Ryan Company, a corpora-
tion, has bought the stock of goods sold by the receiver;
that said company opened the store on October 5, 1891;
that it has fully and promptly replenished said stock,
and has had large crowds to flock to said store;   that in

addition to all the floor room occupied by petitioner, the company has the additional floor room of two stories and a basement of an adjoining store which had been connected with or opened into the store; that the season for such trade is greatly better in October and November than in March, April and May; that in said period the Piedmont Exposition was held and drew a large crowd; and that the sales of the company for two months, under all such favorable circumstances, he is informed and believes, by the affidavit of its president annexed, amounted to $116,333.38. He submits this as the best comparison possible as to the amount of his sales, and positively reaffirms that his sales from March 27 to May 26, inclusive of collections from credit sales, were as stated in his answer to the receiver's petition, and did not produce the money requisite to deposit said sums in the banks as claimed by the receiver, and did produce only the money shown by petitioner to have been expended as aforesaid. He most earnestly and positively reaffirms that he did not at the time of the filing of the bill have, own or control any money or other assets, except such as he delivered to the temporary receiver; that he did not at the time the receiver made demand on him have, own or control the money demanded or any part of it; and that since then and up to the present time he has not owned or controlled said money or any part thereof, or any of said money, and has not now any, and is utterly unable to comply with said order or to pay the sum of $120,490.79 or any part thereof.

Attached to this petition are affidavits of Moore and Sullivan, principals of business colleges, to the effect that they are practical book-keepers of many years experience; that they have made thorough examinations of the bank statements embracing deposits and checks by Stephen A. Ryan (the results of which examinations

are given in detail); that they believe from such exami-
nations that he kept up a regular system of withdrawal
from one bank and redeposit in one of the other two,
from March 26 to May 23, 1891; that this system of
"kiting" would indicate that the purpose was to swell
the apparent sums in the banks; that there is nothing
to indicate that the system did not exist, and from the
inspection and examination made by affiants they are of
opinion that it did exist; and that the fact that some of
the deposit-tickets did not show the amount "kited"
would not disprove that the "kite" existed, as Ryan
could, in the regular course of business, cash checks
when purchases were made and get change when the
check amounted to more than the purchase, and the
amount drawn from bank for redepositing in another
bank could thus be locked up in the checks so cashed,
which could stand for so much of the money intended
to be "kited"; etc. There were various other affidavits
tending to show that the system of withdrawal and re-
deposit was carried on by Ryan for many months
before his failure; that the sum usually "kited" was $2,-
500; that during the period in question probably over
$100,000 was in this way transferred from bank to
bank; that on May 13, 1891, only three checks were
paid by the Atlanta National Bank for Ryan, and these
were for $2,500, $1,000 and $9.79; and that in the
opinion of forty-one of Ryan's salesmen, his average
daily sales for both cash and credit were between $1,000
and $1,200 from March 26, 1891, to the day of the fail-
ure. There was also an affidavit by C. I. Ryan, presi-
dent of the Ryan Company, sustaining the allegations
of the petition of S. A. Ryan as to the amount of busi-
ness done by that company. Also, an affidavit by S. A.
Ryan, that he was not aware of the evidence of Moore
and Sullivan, nor that he could obtain the same as set
forth in their affidavits before the order was passed in

said case, nor could he have submitted the books to them before said order was passed, because there was not any information he had to suggest that he could get the evidence in said affidavits stated, and because in the immense mass of matter involved he had not the time in which to have the books examined by said experts. The affidavit of his counsel was, that they had no knowledge of the existence of the evidence above stated, or that it could be obtained, until the order was passed· in said cause.

The receiver demurred to the petition, on the grounds that it does not set forth sufficient facts necessary to require answer, and shows no fact transpiring since the final order, entitling Ryan to have the same modified, and no facts save such as were fully inquired into on the hearing as to his contempt; that the judgment on that hearing is *res adjudicata;* and that the petition shows no facts sufficient to warrant the discharge of Ryan. The demurrer was sustained and the petition dismissed, and Ryan excepted.

John L. Hopkins & Son, Albert H. Cox, Walter R. Brown and Julius L. Brown, for plaintiff in error.

Calhoun, King & Spalding, N. J. & T. A. Hammond, Rosser & Carter, Alex. W. Smith *et al., contra.*